PATRICIA MISTHOPOULOS *v.* NOEL MISTHOPOULOS
(SC 17816)

Norcott, Katz, Vertefeuille, Zarella and Schaller, Js.*

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

This case was argued prior to the implementation of this court's policy to hear all cases en banc.

Argued September 19, 2008—officially released July 13, 2010

*Kenneth J. Bartschi*, with whom were *Robert M. Shields, Jr.*, and, on the brief, *Susan A. Moch*, for the appellant (defendant).

*Gary I. Cohen*, with whom, on the brief, was *Marci Finkelstein*, for the appellee (plaintiff).

VERTEFEUILLE, J. The defendant, Noel Mistho-poulos, appeals[1] from the judgment of the trial court dissolving his marriage to the plaintiff, Patricia Mistho-poulos, and entering related financial orders. On appeal, the defendant claims that the trial court improperly: (1) ordered him to pay a portion of his net cash employment bonus as child support; (2) retroactively modified pen-dente lite alimony and support orders; (3) divided one of the parties' marital assets twice; (4) admitted a recording into evidence; and (5) ordered him to pay a portion of the plaintiff's attorney's fees.

The following facts, as found by the trial court, and procedural history are relevant to our resolution of the present appeal. The parties were married on June 11, 1988, in Boston, Massachusetts, and have resided con-tinuously in Connecticut since 1998. The parties' only children are triplets (two sons and one daughter) born on April 18, 1996.

At the time of the trial court proceedings, the plaintiff was approximately forty-eight years old. She holds a bachelor's degree from Suffolk University and a mas-ter's degree in business administration from New York University. At the beginning of the parties' marriage, the plaintiff lived and worked in New York City while the defendant completed his law degree in Pennsylva-nia. The plaintiff initially managed a restaurant, working forty to fifty hours per week. After the defendant fin-ished law school, the plaintiff worked three jobs to support the parties while the defendant studied for the bar examination and searched for a job. In 1989, the plaintiff began working at Citibank as an administrative assistant. The plaintiff remained employed by Citibank

---

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

up to and during the first few months of her pregnancy with the triplets, at which time her physician ordered her to remain on bed rest for the remainder of her pregnancy. For the remainder of the parties' marriage, the plaintiff had been a stay-at-home mother. At the time she left her employment with Citibank, the plaintiff was earning approximately $65,000 to $75,000 annually. After the parties separated, the plaintiff obtained her real estate license and had earned approximately $25,000 in commissions at the time of the dissolution proceedings.

At the time of the dissolution proceedings, the defendant was forty-three years old. He holds a bachelor's degree from New York University, a law degree from Villanova University and a master's degree in business administration from New York University. He completed the last year of law school and all of his master's degree program during the parties' marriage. During the course of their marriage, the defendant was employed by a number of different companies, including Credit Suisse/First Boston, Bear Stearns, Deutsche Bank, and Abernathy Consulting. The defendant also operated his own hedge fund for a period of time during the parties' marriage. Since 2004, the defendant has been employed by Bank of America.

The defendant has been very successful in his business career, and the family, which lives in Darien, has enjoyed the financial benefits that flowed from this success.[2] At the time of the dissolution, the defendant was earning a yearly base salary of approximately $150,000. In addition, he earned incentive compensation each year, consisting of an annual cash bonus and an annual stock bonus, which is comprised of both stock options and restricted stock. The defendant receives

[2] For example, we note that the trial court found the value of the family home at the time of dissolution to be $2.6 million.

his incentive compensation in January of each year based on his performance in the previous calendar year. For his performance in 2005, the defendant received a net cash bonus of $565,740. The defendant's taxable wages for 2005, including a bonus for his performance in 2004, were $1,028,612.40.

The plaintiff initiated the dissolution action in 2004. In July, 2006, the trial court dissolved the parties' marriage on the ground of irretrievable breakdown. The trial court awarded the parties joint legal custody of the children, who will reside primarily with the plaintiff. The judgment of the trial court incorporated the parties' parenting agreement, which established a parenting schedule in which the children were with the defendant one weeknight per week and every other weekend both during the school year and in the summer. The trial court's orders further provided a specific parenting schedule for holidays and vacations.

The trial court ordered the defendant to pay the following as child support: $477 per week based on his weekly salary, plus 20 percent of his annual net cash bonus after state and federal taxes are deducted, and 20 percent of any annual state or federal tax refund that he might receive. The trial court further ordered the defendant to pay 67 percent of all work-related daycare expenses, summer day camp expenses, and expenses for extracurricular activities for the minor children. The defendant also was ordered to provide medical and dental insurance for the children and to pay 67 percent of all unreimbursed medical, dental, orthodontia, optical and psychological expenses. The trial court reserved jurisdiction as to how the children's college expenses should be paid and did not enter any order for payment of those expenses.

The trial court ordered the defendant to pay the following in alimony to the plaintiff for a period of ten

years from the date of judgment: $525 per week plus 20 percent of his annual net cash bonus after state and federal taxes; and 20 percent of any state or federal tax refund he received. In addition, the defendant was ordered to obtain medical insurance for the plaintiff for the maximum period allowed by federal law. The defendant also was ordered to designate the plaintiff as the beneficiary of a life insurance policy in the amount of $2 million to remain in effect for as long as he was obligated to pay alimony, child support or postmajority educational support.

The trial court also divided the parties' marital assets, which, other than the marital home, consisted primarily of bank accounts and investment accounts. The total assets awarded to the plaintiff were valued at more than $3.2 million.[3] The total assets awarded to the defendant were valued at more than $457,850.[4] The trial court also awarded the plaintiff 70 percent of the parties' vested restricted stock and 70 percent of the parties' vested stock options. The trial court awarded the defendant 30 percent of the parties' vested restricted stock, 30 percent of the parties' vested stock options and 100 percent of the parties' unvested restricted stock and stock options. This appeal followed.

---

[3] The most significant portion of the plaintiff's award was the family home. The trial court found the value of the family home at the time of dissolution to be $2.6 million. At the time of dissolution, the mortgage on the property was $1.2 million and the parties' equity in the property was $1.4 million. The trial court ordered the plaintiff to give the defendant a mortgage on the home for the principal sum of $420,000 bearing simple interest at the rate of 3 percent per annum, which will be due and payable when the first of the following occurs: the children reaching the age of eighteen, the plaintiff's remarriage or cohabitation, or the home no longer being used as the principal residence of the plaintiff and the children.

[4] Pursuant to the terms of his mortgage on the family home, the defendant will receive an additional $420,000 plus interest when the children reach the age of eighteen years old or upon the occurrence of any of the conditions set forth in his mortgage. See footnote 3 of this opinion.

# I

The defendant first claims that the trial court improperly ordered him to pay 20 percent of his annual net cash bonus as additional child support (additional child support). More specifically, the defendant asserts that the trial court's award was improper because it was not based on the needs of the children and, in addition, that the trial court improperly deviated from the state child support and arrearage guidelines (guidelines); see Regs., Conn. State Agencies § 46b-215a-1 et seq.; in making its award.[5] In response, the plaintiff asserts that the trial court's award was proper and is consistent with General Statutes § 46b-84,[6] and she contends that the guidelines did not apply and therefore that no deviation factors had to be applied. Our resolution of this issue is controlled by the plurality opinion in this court's recent decision, *Maturo* v. *Maturo*, 296 Conn. 80, 995 A.2d 1 (2010). We agree with the defendant as to the additional child support award and, therefore, we

[5] Although the defendant characterizes this claim as one alleging that the trial court misapplied the deviation criteria, a careful review of the record in the present case reveals that, in substance, this is the same claim that was raised by the defendant in *Maturo* v. *Maturo*, 296 Conn. 80, 995 A.2d 1 (2010), which decision this court recently released.

[6] General Statutes § 46b-84 provides in relevant part: "(a) Upon or subsequent to the annulment or dissolution of any marriage or the entry of a decree of legal separation or divorce, the parents of a minor child of the marriage, shall maintain the child according to their respective abilities, if the child is in need of maintenance. Any postjudgment procedure afforded by chapter 906 shall be available to secure the present and future financial interests of a party in connection with a final order for the periodic payment of child support. . . .

"(d) In determining whether a child is in need of maintenance and, if in need, the respective abilities of the parents to provide such maintenance and the amount thereof, the court shall consider the age, health, station, occupation, earning capacity, amount and sources of income, estate, vocational skills and employability of each of the parents, and the age, health, station, occupation, educational status and expectation, amount and sources of income, vocational skills, employability, estate and needs of the child. . . ."

reverse the judgment of the trial court with respect to that order.

The following additional facts are necessary to our resolution of the defendant's first claim. In ordering the defendant to pay child support in the amount of $477 per week plus 20 percent of his annual net cash bonus after state and federal taxes were deducted, the trial court stated the following: "The [guidelines] reach a maximum [combined] weekly income of $4000 per week and the [defendant's] income when his yearly [cash] bonus is included is well in excess of $5000 per week. The basis for the deviation from the [guidelines] is the [defendant's] substantial assets, the [defendant's] superior earning capacity, the extraordinary disparity in parental income, and the significant and essential needs of the [plaintiff] including, but not limited to, the need to provide a home for the children. The court is also making this order because it has not considered the [defendant's] yearly noncash compensation (composed of stock options and restricted stock) in making [its] alimony and child support awards. The court did consider the [defendant's] vested stock options and vested restricted stock in the property division."

We begin by setting forth the applicable standard of review. "The well settled standard of review in domestic relations cases is that this court will not disturb trial court orders unless the trial court has abused its legal discretion or its findings have no reasonable basis in the facts. . . . As has often been explained, the foundation for this standard is that the trial court is in a clearly advantageous position to assess the personal factors significant to a domestic relations case . . . ." (Internal quotation marks omitted.) *Simms* v. *Simms*, 283 Conn. 494, 502, 927 A.2d 894 (2007), quoting *Borkowski* v. *Borkowski*, 228 Conn. 729, 739, 638 A.2d 1060 (1994). "In determining whether a trial court has abused its broad discretion in domestic relations matters, we

allow every reasonable presumption in favor of the correctness of its action." (Internal quotation marks omitted.) *Bender* v. *Bender*, 258 Conn. 733, 740, 785 A.2d 197 (2001). "Notwithstanding the great deference accorded the trial court in dissolution proceedings, a trial court's ruling . . . may be reversed if, in the exercise of its discretion, the trial court applies the wrong standard of law." *Borkowski* v. *Borkowski*, supra, 740. The question of whether, and to what extent, the child support guidelines apply, however, is a question of law over which this court should exercise plenary review. See *Unkelbach* v. *McNary*, 244 Conn. 350, 357, 710 A.2d 717 (1998) (interpretation of statutory scheme that governs child support determinations in Connecticut constitutes question of law); *In re T.K.*, 105 Conn. App. 502, 506, 939 A.2d 9 ("[t]he application of a statute to a particular set of facts is a question of law to which we apply a plenary standard of review"), cert. denied, 286 Conn. 914, 945 A.2d 976 (2008).

The resolution of the defendant's claims regarding the additional child support is dictated by this court's recent decision in *Maturo* v. *Maturo*, supra, 296 Conn. 80, which was argued on the same day as the present case. In *Maturo*, the court decided child support issues that are virtually indistinguishable from the claims raised by the defendant in the present case. The defendant in *Maturo* claimed that the trial court's order awarding 20 percent of his net cash bonus as additional child support was improper because it was not related to the needs of the children and constituted an improper deviation from the guidelines. Id., 88. This court concluded that our statutes and guidelines relating to child support require that "all child support awards must be made in accordance with the principles established therein . . . ." Id., 94–95. The court also concluded that "[a]lthough the guidelines grant courts discretion to make awards on a 'case-by-case' basis above the amount

prescribed for a family at the upper limit of the schedule [of basic child support obligations (schedule) set forth in § 46b-215a-2b (f) of the Regulations of Connecticut State Agencies] when the combined net weekly income of the parents exceeds that limit, which is presently $4000 . . . the guidelines also indicate that such awards should follow the principle expressly acknowledged in the preamble and reflected in the schedule that the child support obligation as a percentage of the combined net weekly income should decline as the income level rises." (Citation omitted.) Id., 95. The court further concluded that "any deviation from the schedule or the principles on which the guidelines are based must be accompanied by the court's explanation as to why the guidelines are inequitable or inappropriate and why the deviation is necessary to meet the needs of the child." Id., 95–96.

This court's conclusion in *Maturo* is dispositive of the defendant's claims relating to the trial court's child support order in the present case. The trial court in the present case ordered the defendant to pay weekly child support in the amount of $477, the amount designated in the schedule when there are three minor children and the combined net weekly income of the family is $2080 per week, or $108,160 per year. Given that the defendant's annual base salary is approximately $150,000 per year and that at the time of dissolution the plaintiff had earned approximately $25,000 in commissions from real estate sales during an approximate seventeen month period, this part of the award is consistent with the guidelines. The trial court, however, also entered an additional child support award of 20 percent of the defendant's annual net cash bonus, which was $565,740 for his performance in 2005. This translates into an increase in child support of approximately $2175 per week, an amount that is more than four times the base award.

As this court concluded in *Maturo*, "[a]lthough the guidelines permit the consideration of bonuses when calculating a family's combined weekly net income; Regs., Conn. State Agencies §§ 46b-215a-1 (11) (A) (iii) and 46b-215a-2b (c) (1) (B); an open-ended child support award of 20 percent . . . of the defendant's variable bonus violates the guideline principles that a declining percentage of the combined net family income should be awarded as the income level rises and that the percentage of any future bonus allocated for child support should be 'generally consistent'; id., § 46b-215a-2b (c) (1) (B) (ii); with the percentages established in the schedule in order to ensure consistency, uniformity and equity in the treatment of persons in such circumstances." *Maturo* v. *Maturo*, supra, 296 Conn. 97. Specifically, pursuant to the schedule set forth in the guidelines, the required weekly support payment for three children declines from 39.87 percent when the combined net weekly income of the family is $310 to 17.16 percent when the combined net weekly income of the family is $4000. Regs., Conn. State Agencies § 46b-215a-2b (f). Consequently, under this court's holding in *Maturo*, child support payments for three children under the guidelines should presumptively not exceed 17.16 percent when the combined net weekly income of the family exceeds $4000, and, in most cases, should reflect less than that amount. See *Maturo* v. *Maturo*, supra, 96.[7]

In *Maturo*, this court further concluded that "when a family's combined net weekly income exceeds $4000, the court should treat the percentage set forth in the schedule at the highest income level as the presumptive

[7] The percentages used in *Maturo* were based on the fact that the parties in that case had two children. See *Maturo* v. *Maturo*, supra, 296 Conn. 96. The parties in the present case have three children. Accordingly, the percentages in the schedule applicable to the parties in the present case are higher.

ceiling on the child support obligation, subject to rebuttal by application of the deviation criteria enumerated in the guidelines, as well as the statutory factors described in § 46b-84 (d)." Id., 106. In *Maturo*, like in the present case, the trial court explained its reasons for deviating from the guidelines as the "[defendant's] substantial assets . . . [and] superior earning capacity, the extraordinary disparity in parental income and the significant and essential needs of the [plaintiff] including, but not limited to, the need to provide a home for the children." (Internal quotation marks omitted.) Id., 99. This court in *Maturo* concluded that the trial court misconstrued the deviation criteria and did not make the necessary finding on the record as to why the guidelines were inequitable or inappropriate in that case. Id., 99–100. Similarly, in the present case the trial court did not make a finding on the record as to why the guidelines were inequitable or inappropriate and its application of the deviation criteria is improper under this court's holding in *Maturo*.

Accordingly, we must conclude that the trial court improperly awarded 20 percent of the defendant's annual net cash bonus as additional child support. We therefore reverse that part of the trial court's judgment and remand the case to that court for reconsideration of any additional child support award consistent with this court's ruling in *Maturo*.

II

The defendant next claims that the trial court improperly modified its pendente lite alimony and child support awards when it ordered him to pay $113,148 as additional child support and $113,148 as additional alimony for 2006. Specifically, the defendant asserts that the trial court's orders requiring him to pay 20 percent of the bonus he had received for his job performance in 2005 as additional child support and additional ali-

mony in 2006 are improper because they constitute a retroactive modification of the pendente lite child support and alimony orders that already were in place. We disagree that the trial court improperly modified retroactively its pendente lite alimony and child support awards by awarding the additional amounts. The additional child support award, however, is improper and must be reversed because it constituted 20 percent of the defendant's bonus and therefore was improper under our conclusion in part I of this opinion.

The following additional facts, as found by the trial court, and procedural history are necessary to the resolution of this claim. An order for pendente lite support previously had been entered on August 19, 2005. Pursuant to that order, the defendant was required to make monthly payments of $4500 to the plaintiff as unallocated alimony and child support. This monthly payment was calculated based on a financial affidavit filed by the defendant in August, 2005, in which the defendant showed only his base salary as his income from employment; he did not include any bonus compensation as income, stating in the affidavit that "because the [stock] incentive and [cash] bonus are performance based, it is impossible to predict the amount, if any, for 2005."

The dissolution trial commenced on May 9, 2006, and judgment entered on July 25, 2006. In its financial orders, the trial court ordered the defendant to pay to the plaintiff, annually, supplemental child support in the amount of 20 percent of his net cash bonus and supplemental alimony in the amount of 20 percent of his net cash bonus. The trial court then ordered that "the [defendant] shall pay the [plaintiff] the sum of $113,148 within seven days of the date of [the trial court's] decision as additional child support for 2006," stating that "[t]he [defendant's] 2005 cash bonus was paid in January, 2006, and has been allocated by the court in the $113,148 payment ordered above. There-

fore, the payment of 20 percent of the [defendant's] cash bonus shall not commence until he receives his 2006 bonus in 2007." The trial court further ordered that "[t]he [defendant] shall pay the [plaintiff] the sum of \$113,148 within seven days of the date of [the trial court's] decision as lump sum alimony for 2006."

We begin our analysis of the defendant's claim by addressing the appropriate standard of review. "An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Notwithstanding the great deference accorded the trial court in dissolution proceedings, a trial court's ruling . . . may be reversed if, in the exercise of its discretion, the trial court applies the wrong standard of law." (Citation omitted; internal quotation marks omitted.) *Williams* v. *Williams*, 276 Conn. 491, 496–97, 886 A.2d 817 (2005); see also *Milbauer* v. *Milbauer*, 54 Conn. App. 304, 312–13, 733 A.2d 907 (1999) (applying abuse of discretion standard to question of whether trial court violated General Statutes § 46b-82 in award of alimony); *Trella* v. *Trella*, 24 Conn. App. 219, 221, 587 A.2d 162 (abuse of discretion standard applied to review of modification of alimony award pursuant to General Statutes § 46b-86 [a]), cert. denied, 219 Conn. 902, 593 A.2d 132 (1991).

The defendant's claim is governed by § 46b-86 (a), which provides in relevant part: "No order for periodic payment of permanent alimony or support may be subject to retroactive modification, except that the court may order modification with respect to any period during which there is a pending motion for modification of an alimony or support order from the date of service

of notice of such pending motion upon the opposing party pursuant to [General Statutes §] 52-50." It is well established that the prohibition against retroactive modification of support orders applies to pendente lite support orders. See, e.g., *Trella* v. *Trella*, supra, 24 Conn. App. 222 ("in the absence of express legislative authorization for retroactive modification of unallocated alimony and support pendente lite, the trial court has no authority to order such modification"); see also *Evans* v. *Taylor*, 67 Conn. App. 108, 117–18, 786 A.2d 525 (2001) (failure to include arrearage of pendente lite support in final order of dissolution constitutes impermissible retroactive modification of pendente lite orders in violation of § 46b-86); *Elliott* v. *Elliott*, 14 Conn. App. 541, 546, 541 A.2d 905 (1988) (trial court's order of dissolution forgiving arrearage of pendente lite alimony constituted improper retroactive modification).

On appeal, the defendant claims that the trial court's financial order regarding the bonus he received in February, 2006, which was based on his job performance for 2005, constitutes an impermissible retroactive modification of the pendente lite order because he received the bonus while the pendente lite order was in effect and the plaintiff had not filed a motion for modification. In support of this assertion, the defendant relies on *Trella* v. *Trella*, supra, 24 Conn. App. 220–21. In *Trella*, the trial court's dissolution order required the defendant to repay loans the plaintiff had received from her father while the dissolution action was pending in addition to the sums the defendant was required to pay pursuant to pendente lite orders. In reversing the judgment of the trial court, the Appellate Court concluded that "[b]y requiring the defendant to make these payments in addition to those required by the pendente lite orders, the trial court, in effect, modified the pendente lite orders retroactively." Id., 221. The Appellate Court further con-

cluded that "[i]t is the function of a pendente lite order to establish what the paying spouse can afford as alimony and support pendente lite. . . . The action of the trial court negated that function of a pendente lite order and was, therefore, not justified under our law." (Citation omitted.) Id., 223. We find *Trella* distinguishable from the present case.

In the present case, the pendente lite order required the defendant to pay $4500 per month in unallocated alimony and child support. That order was based on the defendant's base salary, not on any bonus compensation. Unlike the trial court's orders in *Trella*, the trial court's dissolution orders in the present case did not require the defendant to pay a greater portion of his previously determined income as additional support; nor did the orders modify the amount the defendant had been required to pay during the pendente lite period. Instead, the trial court's orders at issue were based on additional earned income, i.e., the defendant's cash bonus, which was part of his income at the time of the dissolution, but had not been included in his income at the time the pendente lite orders of support were calculated.

As we explained previously herein, when the defendant filed his financial affidavit in connection with the plaintiff's motion for pendente lite support in August, 2005, he did not include any part of his cash bonus in his income. Indeed, the defendant had not received his cash bonus for 2005 at the time when he filed his financial affidavit in connection with the plaintiff's motion for pendente lite orders of support or when the pendente lite support orders were entered. It was only at the time of the dissolution, in July, 2006, that the trial court calculated additional child support and alimony based on the cash bonus that the defendant had

received in February, 2006.[8] Therefore, nothing in the trial court's orders affected or modified the previous pendente lite orders. Instead, the trial court calculated additional postdissolution child support and alimony on the basis of the defendant's newly acquired cash bonus.[9] Accordingly, we conclude that the trial court did not abuse its discretion by requiring the defendant to pay a portion of the bonus that he received in February, 2006, as alimony and support for 2006.

Nevertheless, we must conclude that the portion of the trial court's order requiring the defendant to pay 20 percent of his 2005 net cash bonus as child support is improper because it is inconsistent with this court's holding in *Maturo* v. *Maturo*, supra, 296 Conn. 96, and part I of this opinion. Specifically, with regard to the

[8] In preparation for the trial, the defendant filed his financial affidavit on May 4, 2006. In the affidavit, the defendant included a footnote that stated as follows: "In addition to base salary, the defendant is entitled to participate in a discretionary performance incentive award. For performance in 2005, paid on February 15, 2006, the defendant received cash of $962,500 gross, $565,740 net after taxes. He also received restricted stock units and a Key Associate Stock Plan options award as shown on Schedule C. Because the incentive plan payment is based on future performance, the defendant is unable to predict the amount, if any, of payments he will receive for future years."

[9] Even if the trial court's orders could be understood as retroactive modification of the pendente lite support orders, they did not run afoul of the purpose of § 46b-86 (a). The prohibition against retroactive modification of pendente lite awards that is contained in § 46b-86 (a) was added to the statute in 1990 in order to comply with the federal Bradley Amendment, which is codified at 42 U.S.C. § 666 (a) (9). See Public Acts 1990, No. 90-188, § 1; see also 33 S. Proc., Pt. 9, 1990 Sess., pp. 2702–2705. The purpose of the Bradley Amendment was to promote the collection of child support by prohibiting the retroactive reduction or nullification of past due child support obligations. See S. Rep. No. 348, p. 155 (1986) ("[w]hat the Committee [on the Budget] is seeking to prevent is the purposeful noncompliance by the noncustodial parent, because of his hope that his child support obligation will be retroactively forgiven"); see also 54 Fed. Reg. 15,757–62 (1989). In the present case, it is undisputed that the defendant paid all moneys due under the pendente lite orders and the trial court's order requiring him to pay a portion of his additional income did not result in the retroactive reduction or nullification of past due child support obligations.

additional child support order, the defendant incorporates by reference his claim in part I of this opinion and asserts that requiring the defendant to pay 20 percent of his 2005 net cash bonus is also improper because it was not based on the needs of the children and improperly deviated from the guidelines. For the reasons set forth in part I of this opinion, we agree with the defendant and conclude that the trial court improperly required the defendant to pay 20 percent of his 2005 net cash bonus as additional child support because 20 percent is higher than the 17.16 percent contained in the guidelines for a family whose weekly income is $4000. See Regs., Conn. State Agencies § 46b-215a-2b (f). We therefore reverse the trial court's order and remand the matter to that court for reconsideration consistent with this court's ruling in *Maturo*.

### III

The defendant next claims that the trial court improperly divided one of the parties' marital assets twice. Specifically, the defendant asserts that the trial court improperly divided the parties' vested Bank of America stock in two different ways and that such an impropriety undermines the factual findings on which the trial court's mosaic of financial orders rests and requires a new trial on the financial orders. In response, the plaintiff asserts that even if the trial court improperly divided the parties' vested Bank of America stock, such impropriety is harmless. For reasons different than those asserted by either party, we affirm the trial court's order with regard to the Bank of America stock.

The following additional facts, as found by the trial court, and procedural history are necessary to our resolution of this appeal. In its financial orders, the trial court ordered as follows: "(*l*) The [defendant] shall keep as his sole property his Fidelity Investment account with an approximate balance of $25,450 . . . . (n) The

852.72 shares of Bank of America stock, vested [February, 2006], trading at \$48.23 on July 18, 2006, have an approximate value of \$41,127. The [defendant] owns 2584 shares of restricted stock granted [February 15, 2005]. [One third] vested [February, 2006] and [one third] will vest on [February, 2007] and [February, 2008]. The [defendant] was awarded 7190 shares of Bank of America restricted stock for 2005 performance that vest [one third] on [February, 2007, February, 2008, and February, 2009]. The [defendant] was awarded 500 shares of restricted stock KASP for 2005, vesting [one third] each on [February, 2007, February, 2008, and February, 2009]. Finally, the [defendant] has 7000 unvested stock options granted on [February 16, 2006] with a strike price of \$44.36 per share. The options will vest 2333 on [February 15, 2007] and [February 15, 2008] and 2334 on [February 15, 2009]. The vested restricted stock and any vested stock options shall be divided with the [defendant] receiving 30 percent and the [plaintiff] receiving 70 percent. The [defendant] shall be entitled to 100 percent of the unvested restricted stock and stock options."

We begin by setting forth the applicable standard of review. "The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *Jewett* v. *Jewett*, 265 Conn. 669, 690–91, 830 A.2d 193 (2003).

"With respect to the financial orders predicated on those findings of fact, [the] issues involving financial orders are entirely interwoven. The rendering of a judgment in a complicated dissolution case is a carefully crafted mosaic, each element of which may be dependent on the other. . . . Furthermore, trial courts are endowed with broad discretion to distribute property in connection with a dissolution of marriage." (Internal quotation marks omitted.) *Grimm* v. *Grimm*, 276 Conn. 377, 386, 886 A.2d 391 (2005), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006).

It is undisputed that in his financial affidavit, the defendant indicated that he was awarded 2584 shares of restricted Bank of America stock for his performance in 2004, which were granted on February 15, 2005. The defendant further stated in his financial affidavit that one third of these Bank of America shares vested in February, 2006, and are reflected in the Fidelity Investment account. It is further undisputed that the trial court's financial orders awarded the entirety of the Fidelity Investment account, which contains vested Bank of America stock, to the defendant, but also ordered vested Bank of America stock to be divided between the plaintiff and the defendant, awarding the plaintiff 70 percent and the defendant 30 percent. Neither party, however, sought clarification from the trial court regarding the trial court's alleged double, or inconsistent, division of vested Bank of America stock.[10]

---

[10] The defendant did file a motion for articulation with the trial court in which he sought articulation of the following: "Are the 852.[72] shares of Bank of America stock referenced in [paragraph (n)] the [one third] of the 2584 restricted stock vested in February, 2006? If not, what was the basis for this finding?" The trial court responded as follows: "Paragraph (n) of the financial orders addresses the defendant's Bank of America stock. That paragraph states, in pertinent part, '[t]he 852.72 shares of Bank of America stock, vested [February, 2006], trading at $48.23 on July 18, 2006, have an approximate value of $41,127. The [defendant] owns 2584 shares of restricted stock granted [February 15, 2005]. [One third] vested [February, 2006] and [one third] will vest on [February, 2007] and [February, 2008].' The 852.[72] shares of Bank of America stock referenced in this paragraph are the [one

"As is always the case, the [appellant], here the [defendant], bear[s] the burden of providing a reviewing court with an adequate record for review." *Cable* v. *Bic Corp.*, 270 Conn. 433, 442, 854 A.2d 1057 (2004), citing Practice Book § 61-10. "It is, therefore, the responsibility of the appellant to move for an articulation or rectification of the record where the trial court has failed to state the basis of a decision . . . to clarify the legal basis of a ruling . . . or to ask the trial judge to rule on an overlooked matter. . . . In the absence of any such attempts, we decline to review this issue." (Internal quotation marks omitted.) *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 232, 828 A.2d 64 (2003); see also *Zahringer* v. *Zahringer*, 262 Conn. 360, 370, 815 A.2d 75 (2003) ("[i]t is the responsibility of the appellant to move for an articulation in order to clarify the basis of the trial court's decision should such clarification be necessary for effective appellate review of the issue on appeal"). "[A]n articulation is appropriate where the trial court's decision contains some ambiguity or deficiency reasonably susceptible of clarification. . . . [P]roper utilization of the motion for articulation serves to dispel any . . . ambiguity by clarifying the factual and legal basis upon which the trial court rendered its decision, thereby sharpening the issues on appeal." (Internal quotation marks omitted.) *Alliance Partners, Inc.* v. *Oxford Health Plans, Inc.*, 263 Conn. 191, 204, 819 A.2d 227 (2003).

"Under these circumstances, the [defendant in the present case] should have filed a motion for articulation to preserve an adequate record for review. See Practice Book §§ 61-10 and 66-5. It is well established that [a]n articulation is appropriate where the trial court's decision contains some ambiguity or deficiency reasonably

third] of the 2584 restricted stock that vested in February, 2006." This articulation does not address the issue that the defendant now raises on appeal.

susceptible of clarification. . . . [P]roper utilization of the motion for articulation serves to dispel any . . . ambiguity by clarifying the factual and legal basis upon which the trial court rendered its decision, thereby sharpening the issues on appeal. . . . In the absence of an articulation, we are unable to determine the basis for the court's decision, and we therefore decline to review this claim." (Internal quotation marks omitted.) *Ravetto* v. *Triton Thalassic Technologies, Inc.*, 285 Conn. 716, 732–33, 941 A.2d 309 (2008).

In the present case, the defendant failed to file a motion for articulation seeking clarification from the trial court as to whether it intended to divide the vested Bank of America stock by awarding 100 percent to the defendant in the form of the Fidelity Investment account or by dividing all Bank of America stock, wherever located, 70 percent to the plaintiff and 30 percent to the defendant. Without such an articulation, we have no way of determining whether the trial court overlooked the information in the defendant's affidavit stating that the Fidelity Investment account contained the vested Bank of America stock or made a factual determination that the Fidelity Investment account was an independent marital asset that required separate division. An articulation by the trial court, at the very least, would have aided this court in determining the basis, or lack thereof, for the trial court's decision, and also would have afforded the trial court the opportunity to correct any inconsistencies or miscalculations. Because the defendant failed to seek an articulation from the trial court, we are unable to resolve the defendant's claim. Accordingly, we decline to review that claim.

IV

The defendant also claims that the trial court improperly admitted into evidence an audio recording[11] of a

[11] The recording consisted of the audio portion of a videotape on which the voices of the parties were audible.

dispute between the parties. Specifically, the defendant claims that the recording should have been excluded because the plaintiff failed to produce it during discovery. In response, the plaintiff asserts that the trial court properly admitted the recording into evidence because the plaintiff complied with the discovery requests by bringing it to her deposition and answering questions about it at her deposition. In the alternative, the plaintiff asserts that if the trial court improperly admitted the recording, it constituted harmless impropriety. We agree with the plaintiff.

The following facts and procedural history are necessary to our resolution of this issue. At trial, the plaintiff offered a recording that contained an argument between the parties from 2000 in which the defendant made threatening statements to the plaintiff. The defendant objected to the admission of the recording, claiming that the plaintiff had failed to produce it during discovery, despite numerous discovery requests for production of evidence that included the recording. Specifically, in his motion in limine in the trial court, the defendant stated that the June 21, 2005 notice of deposition served on the plaintiff requested that the plaintiff produce: "[a]ll videotapes on which the defendant is visible and all videotapes and audiotapes on which his voice is audible." The defendant further asserted that the December 7, 2005 and April 6, 2005 notices of deposition served on the plaintiff requested that the plaintiff produce "[a]ll documents and tangible items that refer, relate and/or pertain to the plaintiff's claims that the defendant has been, or is, abusive to the plaintiff and/ or the parties' children, including, but not limited to, photographs, videotapes, audiotapes, reports, etc." At oral argument on the motion, the defendant asserted that, at the plaintiff's deposition, the defendant's counsel asked the plaintiff if she brought any other documents with her to the deposition in response to the

notice of deposition and the plaintiff described a number of financial documents that she had brought with her, but did not mention the recording. The defendant claimed that, despite these repeated discovery requests, the plaintiff failed to produce the recording that she was attempting to introduce into evidence at trial.

In response, the plaintiff asserted that she brought the recording with her to her deposition on May 1, 2006, and answered questions about it at that deposition. The plaintiff asserted that she did not give the recording to the defendant's counsel at her deposition because the defendant's counsel asked her only if she had brought any additional documents and she did not consider the recording a document. The plaintiff further claimed that, at the end of her deposition on May 1, 2006, the defendant's counsel told her that he would be asking her to come back another day for more questioning, so she did not consider her deposition to be finished.

Thereafter, the trial court admitted the recording into evidence stating: "Normally, the court would exclude this recording for failure to disclose it. However, after examining the transcript of the deposition, it was mentioned in the deposition. The court would agree with the plaintiff that a layperson would not necessarily categorize a videotape with audio portion as a document. Therefore, it is a full exhibit."

We first set forth the applicable standard of review. The trial court's ruling is governed by an abuse of discretion standard. "The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence . . . [and its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a mani-

fest abuse of discretion." (Internal quotation marks omitted.) *Jacobs* v. *General Electric Co.*, 275 Conn. 395, 406, 880 A.2d 151 (2005). In addition, "[b]efore a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . The harmless error standard in a civil case is whether the improper ruling would likely affect the result. . . . When judging the likely effect of such a trial court ruling, the reviewing court is constrained to make its determination on the basis of the printed record before it. . . . In the absence of a showing that the [admitted] evidence would have affected the final result, its [inclusion] is harmless." (Internal quotation marks omitted.) *Desrosiers* v. *Henne*, 283 Conn. 361, 366, 926 A.2d 1024 (2007).

In the present case, after examining the record before it, the trial court concluded that the plaintiff's failure to produce the recording during discovery did not bar its admission into evidence at trial. In doing so, the trial court credited the plaintiff's testimony that she did not intentionally withhold the recording from production during discovery. In addition, the trial court recognized that the defendant's counsel had the opportunity to ask the plaintiff about the incident contained on the recording and to cross-examine the plaintiff about this incident. Keeping in mind that the trial court is in a better position than this court to assess the veracity and motives of the parties and their counsel, we cannot conclude that the trial court abused its discretion in admitting the recording into evidence.

V

The defendant's final claim is that the trial court improperly awarded the plaintiff attorney's fees. Specifically, the defendant asserts that the trial court's order ordering him to pay the plaintiff an additional $50,000 as trial attorney's fees and $14,000 as appellate attor-

ney's fees was improper in the present case because: (1) the trial court's other financial awards provided the plaintiff with substantial liquid assets with which to pay her attorney's fees; and (2) the record does not support a finding that the failure to award attorney's fees in this case would undermine the other financial orders. In response, the plaintiff asserts that the trial court did not abuse its discretion in awarding the plaintiff attorney's fees because denying the plaintiff's request for attorney's fees would have undermined the trial court's other financial orders. We affirm the judgment of the trial court.

In its memorandum of decision, the trial court determined as follows: "The [defendant] shall be liable for 75 percent ($7853.85) and the [plaintiff] shall be liable for 25 percent ($2618) of the outstanding legal fees due the guardian ad litem . . . . In addition, the [defendant] and the [plaintiff] shall divide the new retainer of $7500 with the [defendant] paying $5625 and the [plaintiff] paying $1875. All amounts due the guardian ad litem shall be paid in full within [thirty] days of the date of judgment. The [defendant] utilized marital funds to pay his attorney's fees during the course of the dissolution action and contributed some funds towards the [plaintiff's] legal fees. He testified he spent in the vicinity [of] $200,000 [to] $225,000. He made payments totaling approximately $150,000 to the [plaintiff's] lawyers. The [defendant] shall pay to the [plaintiff] within [twenty-one] days of the judgment the sum of $50,000 towards her legal fees." After the defendant filed the present appeal, the plaintiff filed an additional motion for attorney's fees to defend the appeal. In her motion, the plaintiff asserted that she did not have sufficient liquid assets with which to pay for the legal services necessary to defend the appeal. The trial court granted the plaintiff's motion and ordered the defendant to pay an addi-

tional $14,000 to the plaintiff for her attorney's fees associated with the appeal.[12]

General Statutes § 46b-62[13] governs the award of attorney's fees in dissolution proceedings and provides that "the court may order either spouse . . . to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in [§] 46b-82." These criteria include "the length of the marriage, the causes for the . . . dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to [§] 46b-81 . . . ." General Statutes § 46b-82. In making an award of attorney's fees under § 46b-82, "[t]he court is not obligated to make express findings on each of these statutory criteria."

---

[12] The trial court ordered as follows: "The defendant shall pay the plaintiff $25,000 for her appellate counsel fees within ten days of this order. The court is lifting the automatic stay to allow the payment of the $50,000 awarded to [the] plaintiff for her attorney's fees in paragraph thirteen of the memorandum of decision dated [July 25, 2006]. [The] [p]laintiff shall pay the balance owed for her trial counsel fees and apply the approximate[ly] $11,000 remaining to her appellate counsel fees. [The] [d]efendant may deduct that amount from the $25,000 awarded to [the] plaintiff for appellate counsel fees."

[13] General Statutes § 46b-62 provides: "In any proceeding seeking relief under the provisions of this chapter and sections 17b-743, 17b-744, 45a-257, 46b-1, 46b-6, 46b-212 to 46b-213v, inclusive, 47-14g, 51-348a and 52-362, the court may order either spouse or, if such proceeding concerns the custody, care, education, visitation or support of a minor child, either parent to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in section 46b-82. If, in any proceeding under this chapter and said sections, the court appoints an attorney for a minor child, the court may order the father, mother or an intervening party, individually or in any combination, to pay the reasonable fees of the attorney or may order the payment of the attorney's fees in whole or in part from the estate of the child. If the child is receiving or has received state aid or care, the reasonable compensation of the attorney shall be established and paid by the Commission on Child Protection."

(Internal quotation marks omitted.) *Grimm* v. *Grimm*, supra, 276 Conn. 397.

"Courts ordinarily award counsel fees in divorce cases so that a party . . . may not be deprived of [his or] her rights because of lack of funds. . . . Where, because of other orders, both parties are financially able to pay their own counsel fees they should be permitted to do so. . . . *Koizim* v. *Koizim*, 181 Conn. 492, 501, 435 A.2d 1030 (1980). An exception to the rule announced in *Koizim* is that an award of attorney's fees is justified even where both parties are financially able to pay their own fees if the failure to make an award would undermine its prior financial orders . . . . *Eslami* v. *Eslami*, 218 Conn. 801, 820, 591 A.2d 411 (1991). Whether to allow counsel fees [under § 46b-82], and if so in what amount, calls for the exercise of judicial discretion. . . . *Holley* v. *Holley*, [194 Conn. 25, 33–34, 478 A.2d 1000 (1984)]. An abuse of discretion in granting counsel fees will be found only if [an appellate court] determines that the trial court could not reasonably have concluded as it did. *Unkelbach* v. *McNary*, 244 Conn. 350, 374, 710 A.2d 717 (1998), quoting *Cook* v. *Bieluch*, 32 Conn. App. 537, 544, 629 A.2d 1175, cert. denied, 228 Conn. 910, 635 A.2d 1229 (1993)." (Internal quotation marks omitted.) *Bornemann* v. *Bornemann*, 245 Conn. 508, 543, 752 A.2d 978 (1998).

On appeal, the defendant asserts that the trial court abused its discretion by awarding the plaintiff attorney's fees in the present case because the plaintiff had sufficient liquid assets to pay the attorney's fees as a result of the other financial orders. We disagree. In the present case, the plaintiff does not have ample liquid assets. Although the trial court awarded the plaintiff substantial assets, the majority of those awards were not liquid assets. Specifically, $2.6 million of the approximately $3.2 million in assets awarded to the plaintiff consisted

of the family home in which the plaintiff and the parties' three minor children resided. The property awarded to the plaintiff also included her interest in a trust that owned the property occupied by her parents in Massachusetts, and certain retirement accounts, vested stock and vested stock options. Therefore, although the plaintiff has some liquid assets as a result of the other financial orders, the overwhelming majority of the assets awarded to the plaintiff were not liquid assets. "In *Arrigoni* v. *Arrigoni*, 184 Conn. 513, 519–20, 440 A.2d 206 (1981), we clarified [the rule announced in] *Koizim* by stating that 'we did not mean to imply that no allowance should be made if a party has sufficient cash to meet an attorney's bill,' pointing out that *Koizim* was based on the circumstance that the recipient of the counsel fee award had 'ample liquid funds.' " *Eslami* v. *Eslami*, supra, 218 Conn. 820. Accordingly, although the plaintiff has some liquid assets because of the other financial awards in this case, we cannot conclude that the plaintiff had "ample" liquid funds such that the trial court abused its discretion by awarding the plaintiff attorney's fees.

The defendant further claims that there was not sufficient evidence in the record to support a finding that denying the plaintiff's request for attorney's fees would undermine the other financial orders in this case. We disagree, and conclude that the record in this case does provide sufficient evidence to support a finding that denying the plaintiff's request for attorney's fees would have undermined the financial orders in this case. The record demonstrates that the defendant has a significantly higher earning capacity than the plaintiff, and that during the parties' eighteen year marriage, the plaintiff had been a stay-at-home mother for the last ten years of the marriage. This court has previously

noted that "[s]ince the trial court fashioned the other financial awards, it [is] uniquely qualified to determine whether those awards would be undermined by rejecting [a party's] request for counsel fees and expenses. All the awards were made at the same time and were predicated on the assumption that the total of all the awards regardless of the items to which they were apportioned, was reasonable in the light of the respective financial abilities of the parties and the criteria set forth in § 46b-82." Id.

In the present case, the financial orders of the trial court required the plaintiff to pay a share of many expenses, including the medical, day care, summer camp and extracurricular activities of the children, attorney's fees for the guardian ad litem and a portion of her own attorney's fees, including for her appellate counsel. All of the other financial awards, however, clearly required the defendant to pay a larger portion of the expenses presumably in light of his significantly higher earning capacity. Accordingly, we conclude that the record supports a finding that the order requiring the defendant to pay a portion of the plaintiff's attorney's fees in this case was necessary so as not to undermine the other financial orders.

The defendant cites *Maguire* v. *Maguire*, 222 Conn. 32, 44–45, 608 A.2d 79 (1992), in support of his claim that the trial court abused its discretion by awarding the plaintiff attorney's fees in the present case. We find *Maguire* to be inapposite to the present case. In *Maguire*, this court reversed the judgment of the trial court awarding the wife $50,000 in attorney's fees because there was nothing in the record to support a finding that denying her an award of attorney's fees would undermine the other financial orders in the case. Id. This court placed significant reliance on the fact that the wife had $500,000 in liquid assets prior to any of the financial awards made in the dissolution action.

Id., 44. The wife in *Maguire* had received these funds from the estate of her deceased mother. Id., 44 n.13. In the present case, there is no evidence that the plaintiff had any liquid assets available to her prior to the financial awards made in the dissolution action, and as we have explained previously herein, most of the assets awarded to the plaintiff did not constitute liquid assets. We are not persuaded, therefore, that *Maguire* is applicable to the present case.

We further note that, in the present case, the trial court determined that the defendant had used the parties' marital assets to pay his attorney's fees and had paid approximately $200,000 to $225,000 for his attorney's fees, but had used marital assets to pay only $150,000 toward the plaintiff's attorney's fees. By requiring the defendant to pay an additional $50,000 of the plaintiff's trial attorney's fees and a portion of her appellate attorney's fees, it is reasonable to presume that the trial court was attempting to equalize the amount of marital assets that were used to pay each of the parties' attorney's fees. Accordingly, we find nothing in this record that persuades us that the trial court abused its discretion in ordering the defendant to pay a portion of the plaintiff's attorney's fees.

VI

"We previously have characterized the financial orders in dissolution proceedings as resembling a mosaic, in which all the various financial components are carefully interwoven with one another. . . . Accordingly, when an appellate court reverses a trial court judgment based on an improper alimony, property distribution, or child support award, the appellate court's remand typically authorizes the trial court to reconsider all of the financial orders. . . . We also have stated, however, that [e]very improper order . . . does

not necessarily merit a reconsideration of all of the trial court's financial orders. A financial order is severable when it is not in any way interdependent with other orders and is not improperly based on a factor that is linked to other factors. . . . In other words, an order is severable if its impropriety does not place the correctness of the other orders in question." (Citations omitted; internal quotation marks omitted.) *Maturo* v. *Maturo*, supra, 296 Conn. 124–25.

We conclude that the trial court orders requiring the defendant to pay 20 percent of his annual net cash bonus, 20 percent of any undetermined future tax refund, and 20 percent of his 2005 net cash bonus as child support are severable from the alimony, property distribution and other unrelated financial orders. These orders are inextricably linked, however, to the remaining child support orders concerning payment for comprehensive health insurance, unreimbursed medical expenses, education, day care, summer camp and extracurricular activities. Although the defendant does not challenge those orders, the percentage award of bonus income constituted a significant component of the total child support award. Consequently, any new determination of child support will necessitate reconsideration of all of the child support orders to ensure that the total award will be proper in all respects.

The judgment is reversed only with respect to all of the child support orders and the case is remanded to the trial court for further proceedings on those orders according to law; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.