******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ZARELLA, J., dissenting. I fear that the majority's opinion in the present case is the beginning of a grave and perilous road for matrimonial law in Connecticut, and, therefore, I respectfully dissent. By upholding the trial court's $7.5 million lump sum alimony award, the majority eviscerates the parties' *enforceable*[1] premarital agreement, defeats the purpose behind the Connecticut Premarital Agreement Act (act), General Statutes § 46b-36a et seq., and fails to keep pace with the development of matrimonial law in our sister states. In light of the majority's opinion, an enterprising trial court struck by sympathy for a recent divorcee who entered into a less than favorable—*but not unconscionable*—premarital agreement may now end-run the agreement, consciously or subconsciously, by awarding greater "alimony," unless the agreement expressly provides for the level of alimony. Today's result defeats Connecticut's public policy of encouraging the private settlement of family matters and removes the predictability the act was intended to create. See, e.g., Conn. Joint Standing Committee Hearings, Judiciary, Pt. 7, 1995 Sess., p. 2492 ("[one] purpose of the [proposed] [a]ct is to provide certainty as to the enforceability of the provisions in premarital agreements"). Prospective spouses who enter into premarital agreements that settle issues of property division in the unfortunate event of a future divorce but leave for the courts the award of alimony—a seemingly prudent decision[2]—do so at their own risk. No longer can such prospective spouses be sure that the Connecticut courts will honor their intentions as expressed in the agreement. Until the legislature addresses the majority's conclusions, attorneys are well advised to include alimony waivers or provisions setting alimony amounts and terms in premarital agreements.

I

LUMP SUM ALIMONY AWARD

In the present case, the majority upholds the trial court's financial order awarding the plaintiff, Marjorie Hornung, lump sum alimony of $7.5 million. The defendant, Robert Hornung, claims that, in light of the periodic alimony award, the property settlement resulting from the premarital agreement, and the trial court's express reliance on statutory criteria pertaining to property division, the lump sum alimony award was an improper property distribution in contravention of the parties' premarital agreement. More specifically, the defendant claims that the parties intended that all property matters be settled by the premarital agreement. He argues that the lump sum alimony award subverted such intention because it was, either in fact or function, a disguised property distribution. To support his contention that the alimony award is a property distribu-

tion, the defendant argues, among other things, that the support award far exceeds what the plaintiff requires for her support and maintenance.[3] I agree with the defendant that the lump sum alimony award is a functional property distribution. I reach this conclusion in light of the fact that the support award in the present case far exceeds the plaintiff's need for support and maintenance, *and* requires the defendant to invade his assets to satisfy the obligation. I additionally conclude that the lump sum alimony award undermines the premarital agreement because the agreement contemplated alimony, which is an award sufficient to allow the recipient to continue in his or her current lifestyle. In the present case, however, the trial court's alimony award exceeds an amount sufficient for such purpose and the reasonable bounds of discretion. For these reasons, I would reverse the judgment of the trial court and remand the case for the entry of new financial orders.[4]

An understanding of the premarital agreement is essential to the resolution of the defendant's claim. On July 14, 1997, the plaintiff and the defendant executed a premarital agreement. The agreement defines and identifies each party's separate property. It also defines marital property as "all property that is acquired by either or both parties subsequent to the marriage . . . ." In the event of dissolution of the marriage, the agreement provides that each party shall retain his or her separate property, the defendant will retain the marital property, except for certain personal property, and the plaintiff will receive from the defendant a property settlement payment. A formula for determining the amount of the property settlement payment is provided in the agreement. The payment amount increases with the length of the marriage and the number of children of the marriage. It was the express intention of the parties that the property distribution effectuated by the agreement fully satisfy both party's claims to property under Connecticut's equitable property distribution statute, General Statutes § 46b-81. The agreement also provides that "a court of competent jurisdiction shall address the issues of alimony and/or child support, both temporary and permanent . . . ."[5] In July, 2008, the parties amended the agreement. At the time of the dissolution, the trial court found that, under the terms of the amended agreement, the plaintiff was to receive a property settlement payment of $4.75 million, $1.25 million under the terms of the original agreement and an additional $3.5 million pursuant to the July, 2008 amendment for her separate interest in the marital home.

In addressing alimony and child support, the trial court ordered the defendant to pay the plaintiff periodic unallocated alimony and child support, as well as lump sum alimony. The court awarded $40,000 per month in periodic unallocated alimony and child support, which the parties do not challenge on appeal. That award is

time limited, ending upon the death of either party, the plaintiff's remarriage, or in March, 2029, at which time the plaintiff will be sixty years old. In addition, the periodic award provides the plaintiff with an income safe harbor of $50,000.[6] The court also awarded the plaintiff $7.5 million in lump sum alimony, payable in twenty semiannual installments of $375,000. The lump sum award is nonmodifiable, survives the death of either party, and does not terminate upon the remarriage of the plaintiff. During the ten years that the plaintiff will receive both periodic and lump sum alimony payments, she will collect monthly support of $102,500. The lump sum alimony payments will end in 2024, at which time all four of the parties' children will be well past the age of majority.[7] Thereafter, the plaintiff will continue to receive the monthly periodic unallocated alimony and child support until March, 2029, unless she has remarried or she or the defendant has died.

The trial court's $7.5 million award, despite being characterized by the court as lump sum alimony, operates as a property distribution and subverts the premarital agreement. The award functions as a property distribution because it (1) exceeds the plaintiff's support and maintenance needs, *and* (2) requires the defendant to invade the assets he retained pursuant to the premarital agreement in order to meet the claimed alimony obligation.[8]

I will first address the excessiveness of the alimony, beginning by setting forth the legal principles that govern this determination. Generally, trial courts enjoy broad discretion when equitably distributing property and entering alimony orders in a marital dissolution case. E.g., *Greco* v. *Greco*, 275 Conn. 348, 354, 880 A.2d 872 (2005). Such broad discretion is necessary due to the myriad circumstances surrounding marriage dissolution actions and the court's objective to place each spouse in an equitable postdissolution position. See, e.g., *Kiniry* v. *Kiniry*, 299 Conn. 308, 316, 9 A.3d 708 (2010); *Mickey* v. *Mickey*, 292 Conn. 597, 615, 974 A.2d 641 (2009). It has often been said that the court's equitable power is "the keystone [of] the court's ability to fashion relief" when dissolving a marriage and that, without it, and the court's broad discretion, it might be impossible to fairly resolve some dissolution disputes. *Sunbury* v. *Sunbury*, 210 Conn. 170, 174, 553 A.2d 612 (1989). Nevertheless, divorce is a creature of statute, and the court's authority to provide relief in such cases is derived therefrom. Id.; *Rubin* v. *Rubin*, 204 Conn. 224, 229, 527 A.2d 1184 (1987). General Statutes §§ 46b-81 and 46b-82 provide the court with its primary tools for rendering an equitable dissolution of marriage. *Mickey* v. *Mickey*, supra, 615.

With respect to § 46b-81, the Superior Court is empowered to "assign to either spouse all or any part of the estate of the other spouse." General Statutes

§ 46b-81 (a). The purpose of such property distribution "is to unscramble existing marital property in order to give each spouse his or her equitable share at the time of dissolution." *Smith* v. *Smith*, 249 Conn. 265, 275, 752 A.2d 1023 (1999). In applying § 46b-82, the court is permitted to order either spouse or both spouses to pay alimony to the other spouse; see General Statutes § 46b-82 (a); see also *Smith* v. *Smith*, supra, 280 (concluding that § 46b-82 permits trial courts to order both spouses to pay alimony); and the purpose of such award is to provide for the continuing support and maintenance of the recipient spouse.[9] See, e.g., *Dombrowski* v. *Noyes-Dombrowski*, 273 Conn. 127, 132, 869 A.2d 164 (2005). Although each of these statutory provisions serves a divergent purpose, they are nonetheless interrelated and complementary. See *Mickey* v. *Mickey*, supra, 292 Conn. 615. Indeed, § 46b-82 (a) provides that alimony may be awarded "*in addition to or in lieu of*" a property division, and it directs the court, in determining whether alimony should be awarded, to consider any distribution it made under § 46b-81. (Emphasis added.) Moreover, the factors to be considered under each statute largely overlap. In assigning property under § 46b-81 and determining whether alimony should be awarded under § 46b-82, the court must consider, inter alia, "the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate . . . and needs of each of the parties . . . ." General Statutes § 46b-81 (c); accord General Statutes § 46b-82 (a). Under the property division statute, the court must also consider each party's liabilities, contributions to the "acquisition, preservation or appreciation in value of their respective estates," and future opportunities to acquire capital assets and income; General Statutes § 46b-81 (c); and, in rendering alimony orders, the court must consider whether the alimony recipient is the custodial parent of any minor children and the desirability and feasibility of such parent securing employment. General Statutes § 46b-82 (a).

Pursuant to §§ 46b-81 and 46b-82, trial courts may balance property distributions and alimony awards to achieve a fair and equitable result in dissolving a marriage. See *Sunbury* v. *Sunbury*, supra, 210 Conn. 174–75 (concluding that reversing one element of financial order and limiting remand to reconsideration of that element "would impede the trial court's ability to weigh the statutory criteria for financial orders to achieve an equitable result" because "issues involving financial orders are entirely interwoven" and "rendering of a judgment in a complicated dissolution case is a carefully crafted mosaic, each element of which may be dependent on the other" [internal quotation marks omitted]). Nevertheless, these statutes are distinct and serve separate purposes, namely, property division and spousal

support. See *Mickey* v. *Mickey*, supra, 292 Conn. 615–16 ("Despite their close relationship . . . the purposes and operation of §§ 46b-81 and 46b-82 are distinct . . . . [T]he purpose of § 46b-81 is to unscramble the spouses' current property interests . . . [whereas] the purpose of § 46b-82 is to recognize the obligation of support that spouses assume toward each other by virtue of the marriage." [Citation omitted; internal quotation marks omitted.]). The dividing line between the two statutes becomes particularly important when the divorcing parties have entered into a premarital agreement that completely resolves the property distribution, such as in the present case.

The existence of a premarital agreement in a dissolution action implicates additional statutory provisions, namely, the Connecticut Premarital Agreement Act (act), General Statutes § 46b-36a et seq. The act authorizes premarital agreements and provides for the form and permissible content of such agreements. See General Statutes §§ 46b-36c and 46b-36d. It also sets forth the factors that courts are to consider in determining whether premarital agreements are enforceable. See General Statutes § 46b-36g. When divorcing spouses invoke these statutory provisions to seek enforcement of a premarital agreement in a dissolution proceeding, these provisions come into tension with §§ 46b-81 and 46b-82. In such cases, therefore, we must harmonize the dissolution court's broad discretion, conferred by §§ 46b-81 and 46b-82, with the parties' right and intention to settle the property distribution and/or alimony issues privately, as permitted by the act. Cf. *Rainforest Cafe, Inc.* v. *Dept. of Revenue Services*, 293 Conn. 363, 377–78, 977 A.2d 650 (2009) ("we must, if possible, construe two statutes in a manner that gives effect to both, eschewing an interpretation that would render either ineffective" [internal quotation marks omitted]). At the very least, it should be obvious that premarital agreements have some impact on the operation of §§ 46b-81 and 46b-82. If they did not, premarital agreements and the act would be meaningless.

This case presents this court with its first opportunity to clarify the impact that a premarital agreement has on a trial court's discretion to structure financial orders pursuant to §§ 46b-81 and 46b-82. In the presence of a premarital agreement that distributes the parties' property but leaves open the question of alimony, the trial court's broad discretion in fashioning financial orders, by necessity, becomes limited. See, e.g., *Walker* v. *Walker*, 765 N.W.2d 747, 753–54 (S.D. 2009); see also *Hannon* v. *Hannon*, 740 So. 2d 1181, 1187 (Fla. App. 1999) ("A primary purpose of [a premarital] agreement is to modify or shrink the general discretion of the dissolution . . . [court] in doing equity between the parties. The agreement itself is intended to define the mutual equities, and the [dissolution court] is not free to ignore its provisions *or to render them ineffective*."

[Emphasis added.]). The trial court's discretion in dissolution matters could be thought of as a sliding scale. At one end of this scale, where the court has the greatest discretion to craft financial orders, is the case in which the parties have not executed a premarital agreement. In such cases, the court may begin by unscrambling the marital assets through consideration and weighing of the factors enumerated in § 46b-81. Then, the court might turn to alimony, assessing the alimony recipient's support needs, in accordance with the factors set forth in § 46b-82. Of course, the amount and type of property awarded to the recipient spouse may impact that spouse's ability to meet all, or some, of his or her support needs and thereby affect the appropriate alimony amount. See *Walker* v. *Walker*, supra, 751 ("[c]ourts are to consider property division and spousal support jointly because an award of more assets can eliminate or reduce the need for spousal support and vice versa" [internal quotation marks omitted]). It is this sequence of events—the property distribution, the alimony order, and the assessment of the alimony recipient's ability to provide for his or her own needs in light of the property distribution—that I am referring to when I speak of balancing the property distribution and alimony award. The trial court is balancing the orders in the sense that the alimony recipient's needs and ability to provide for those needs may vary depending on the type and amount of property that he or she is awarded through the equitable distribution of property. See id.

Conversely, when the parties have entered into a premarital agreement that divides the separate and marital property, but does not address or prohibit alimony, the court's discretion necessarily narrows.[10] Under such circumstances, the trial court no longer has any discretion to divide the parties' property under § 46b-81. Likewise, because the court cannot distribute the property, it no longer has the flexibility to balance the property and alimony awards, at least not in the same sense. Instead, the court is working from a fixed property settlement, one the parties have decided is acceptable, and the court's role is to determine, *in light of that property distribution*, whether an alimony award should be made and, if so, in what amount and under what terms. The fixed property settlement also influences the alimony obligor's ability to meet an alimony obligation and the alimony recipient's support and maintenance needs.[11] Thus, the trial court's discretion is limited to making an award that provides for the support of the recipient spouse, and the court need only consider how the property settlement impacts that alimony recipient's ability to provide for himself or herself and the alimony obligor's ability to satisfy the alimony obligation. Stated differently, the award should reflect what the alimony recipient needs in order to maintain, to the extent practicable, the lifestyle he or she enjoyed during the marriage, in light of the property

distribution reached by the parties. The award should not attempt to counterbalance the property distribution reached by the parties in the name of doing equity.

My view of the interrelationship between § 46b-81, § 46b-82, and a premarital agreement is supported by the legislative history of the act. See Public Acts 1995, No. 95-170 (P.A. 95-170). The purpose of the act was to "serve as a guideline and standard for planning for people who are entering into a marriage . . . [and] to provide certainty as to the enforceability of the provisions in premarital agreements . . . ." Conn. Joint Standing Committee Hearings, supra, p. 2492; see also 38 H.R. Proc., Pt. 9, 1995 Sess., p. 3210, remarks of Representative Ellen Scalettar ("This bill establishes standards and guidelines for premarital agreements. It includes what the agreements may have in them, what they can include, and also under what conditions the agreements will be unenforceable."). Thus, the act provides prospective spouses with the necessary tools to ensure that, in the unfortunate event of a divorce, they, themselves, may settle their financial affairs and that the trial court will honor their expectations. Such an objective is consistent with the noted public policy of this state to encourage the private resolution of family matters and to foster the "private settlement of the financial affairs of estranged marital partners . . . ." (Internal quotation marks omitted.) *Billington* v. *Billington*, 220 Conn. 212, 221, 595 A.2d 1377 (1991). These purposes and policies would be undermined, however, if the trial court were allowed to order alimony that unreasonably exceeds the support needs of the alimony recipient.

With respect to the present case, for the first ten years following the divorce, the plaintiff will receive $102,500 in monthly support through periodic and lump sum alimony. Thereafter, she will continue to receive monthly periodic unallocated alimony and child support until March, 2029, unless she has remarried or she or the defendant has died. The trial court found, in relation to the alimony award, that time limited alimony was proper and that the purpose of both periodic and lump sum alimony was to provide for the continued support of the plaintiff. In addition, the trial court decided that, "under all the circumstances, an award of lump sum alimony payable over time, in addition to the award of periodic alimony, [was] appropriate to provide for [the] continuing support of the [plaintiff] . . . given the [plaintiff's] health issues, her lack of recent employment, her primary child care responsibilities for four children, which limits her ability to enter the workforce on a full-time basis, and her limited opportunity to acquire assets in the future."

In light of the more limited discretion trial courts have to fashion alimony orders when the parties have entered into a premarital agreement, reviewing courts

should carefully evaluate such awards. In this case, the record reveals that the plaintiff's monthly support need is approximately $45,000.[12] The monthly support that the plaintiff receives pursuant to the trial court's financial orders, however, far exceeds such need. Under the current financial orders, the plaintiff will receive $102,500 in monthly support over the next ten years. That is approximately $57,500 per month, or $690,000 per year, more than she claims to need. Thus, during that ten year period, she will collect $6.9 million in alimony that is not attributable to her need for support and maintenance.[13]

In light of these facts, it is difficult to understand how the financial support orders in the present case comport with the limited support purpose of alimony. The plaintiff contends that the award was not excessive and results in only minimal surplus, if any.[14] She argues that the periodic award of $40,000 per month is insufficient to provide for her expenses, let alone the expenses of the children, which the award, as unallocated alimony and child support, was intended to cover.[15] In addition, she asserts that the shortage is even greater when the tax consequences of the alimony award are considered, and, therefore, the lump sum award was necessary to provide for the shortfall between her and her children's needs, on the one hand, and the periodic unallocated alimony and child support award, on the other. Even if one were to accept these arguments, the approximately $6.9 million in alimony that is not attributable to the plaintiff's monthly expenses, which include considerable child care costs; see footnote 15 of this opinion; will certainly provide for the children and the tax consequences of the periodic award, and still result in more than minimally excessive alimony. This is particularly true in light of the fact that the defendant is responsible for a substantial amount of the expenses related to the children. In addition to the child support award, the defendant is required to maintain health and dental insurance for the minor children, provide for 60 percent of their unreimbursed medical and dental expenses, including orthodontic, optical, pharmaceutical and psychological expenses, and pay for one half of the children's extracurricular activities. Moreover, one child has reached the age of eighteen, another child, who is currently sixteen, is quickly approaching the age of majority, and the other two children are not particularly young—fourteen and eleven, respectively.[16]

The majority acknowledges that, at the very least, the monthly alimony award of $102,500 exceeds the plaintiff's stated monthly need of $65,444 per month.[17] Nevertheless, the majority argues that this fact alone does not transmute the lump sum alimony award into a functional property distribution. Instead of ending its inquiry there, however, the majority suggests, in light of the marital standard of living, the factors set forth

in § 46b-82, the relative division of the marital estate, and the lack of a specific allocation for child support, that, perhaps, the lump sum alimony award is not excessive or improper at all. I will address each unpersuasive contention in turn.[18]

I agree that divorcing spouses are entitled, to the extent practicable, to maintain the standard of living they enjoyed during the marriage and that alimony may be awarded for such purpose.[19] See, e.g., *Brody* v. *Brody*, 315 Conn. 300, 313, 105 A.3d 887 (2015) ("[t]he generally accepted purpose of . . . alimony is to enable a spouse who is disadvantaged through divorce to enjoy a standard of living commensurate with the standard of living during marriage" [internal quotation marks omitted]); *Dan* v. *Dan*, 315 Conn. 1, 11, 105 A.3d 118 (2014) ("[o]ne reason for the abandoned spouse's entitlement to sufficient alimony to ensure the continued enjoyment of the standard of living that he or she enjoyed during the marriage is that the spouse's efforts increased the other's earning capacity at the expense of [his or] her own" [internal quotation marks omitted]). I further agree that the parties in the present case enjoyed a high standard of living. I cannot agree, however, that the alimony award is necessary for the plaintiff to maintain such a standard.

The trial court made no finding regarding the marital standard of living or the monthly marital expenses. Nevertheless, pursuant to Practice Book § 25-30 (a), both the plaintiff and the defendant submitted financial affidavits to the trial court, which cataloged their current incomes, expenses, assets, and liabilities around the time of the dissolution. Our cases have made clear that courts are entitled to rely on the truth and accuracy of such affidavits. See, e.g., *Billington* v. *Billington*, supra, 220 Conn. 219. If the trial court is entitled to rely on such affidavits, I see no reason why this court cannot also rely on such affidavits, particularly when the trial court has not discredited such affidavits and appears to have relied on them itself. The plaintiff's affidavit reveals monthly expenses of approximately $45,000, and a cursory review of her affidavit leaves the reviewer with but one reasonable conclusion, namely, that $45,000 per month is the cost of maintaining her current lifestyle, not, as the majority seems to suggest, merely the cost of her basic living expenses. A sampling of the plaintiff's monthly expenses is illustrative: more than $2000 for clothing, approximately $1300 for "personal care," including costs for hairdressing, manicures, pedicures, massages, and fitness classes, and more than $3800 for entertainment, travel, and vacations. The defendant's affidavit discloses monthly expenses of $97,645. Contained in that amount is a monthly expense for alimony and child support in the amount of $46,000. When the alimony and support expense is subtracted, the defendant is left with $51,645 in his own living expenses. Given the similarity in the monthly expenses

disclosed by the plaintiff and the defendant, it appears from the record that, in order to sustain their current lifestyle, the parties each need between $45,000 and $52,000 per month. Such a conclusion is further supported by the parties' stipulation for unallocated alimony and child support, *pendente lite*, of $46,000 per month. Of course, the trial court made no finding in this regard, and it is not the province of this court to do so. I highlight these facts simply to make the following point: no trial court could reasonably conclude that an alimony award of $102,500 per month, an amount that is nearly 230 percent of the plaintiff's monthly expenses, is proper based on the facts of the present case. Moreover, the record reveals no evidence that would support a finding that the plaintiff's monthly expenses—and, therefore, the cost of maintaining her current lifestyle— are anywhere near $102,500.

Next, the majority notes, and correctly so, that the marital standard of living, or station, and expenses, or needs, of the parties are but two of the statutory factors that the trial court is to consider when entering alimony orders. Consideration of all the factors, the majority states, "militates against characterizing the lump sum alimony award as a property distribution." Text accompanying footnote 25 of the majority opinion. I presume this means that the majority has concluded, in light of the statutory factors set forth in § 46b-82, that the alimony award is not excessive or improper. See footnote 18 of this opinion. I disagree.

First, the majority mistakenly assumes that the § 46b-82 factors go exclusively to the alimony award amount, and, therefore, because that statute includes factors in addition to "station" and "needs," an alimony award may properly exceed the recipient's support and maintenance needs. Section 46b-82 does direct the trial court to consider factors other than station and need, such as "the length of the marriage, the causes for the . . . dissolution of the marriage . . . the age, health . . . occupation, amount and sources of income, earning capacity, vocational skills, education, employability, [and] estate . . . of each of the parties . . . ." General Statutes § 46b-82 (a). These factors are not only relevant for determining the amount of an alimony award, but they must also be considered "[i]n determining *whether alimony shall be awarded, and the duration . . . of the award* . . . ." (Emphasis added.) General Statutes § 46b-82. To be sure, not all factors go to the cost of maintaining the recipient's lifestyle. Nonetheless, they do relate to the recipient's support and maintenance needs. More specifically, the factors help the trial court determine, in light of the recipient's assets and income, the amount and duration of alimony necessary for the recipient to maintain the lifestyle that he or she enjoyed at the time of dissolution. For example, the court is to consider the age, health, occupation, amount and sources of income, earning capacity, vocational skills,

education, and employability of the parties. These factors, as they relate to the recipient spouse, inform the court of the recipient's current income or potential future income and, therefore, his or her ability or inability, as the case may be, to provide for his or her own support needs, at least in part. For example, if the recipient did not work for the greater portion of the marriage, like the plaintiff in the present case, such recipient's age, health, vocational skills, education, and employability may lead the trial court to conclude that he or she, despite having been unemployed during the marriage, can, in time, find employment, potentially reducing the amount, or shortening the duration, of the alimony needed.[20]

Second, and relatedly, it is an axiom of matrimonial law that the purpose of alimony is to provide the recipient with support and maintenance. See, e.g., *Dan* v. *Dan*, supra, 315 Conn. 10 ("[h]istorically, alimony was based [on] the continuing duty of a divorced husband to support an abandoned wife and should be sufficient to provide her with the kind of living [that] she might have enjoyed but for the breach of the marriage contract by the [husband]" [internal quotation marks omitted]); *Simms* v. *Simms*, 283 Conn. 494, 503, 927 A.2d 894 (2007) ("[t]he traditional purpose of alimony is to meet one's continuing duty to support" [internal quotation marks omitted]); *Gay* v. *Gay*, 266 Conn. 641, 647, 835 A.2d 1 (2003) ("[t]he purpose of both periodic and lump sum alimony is to provide continuing support" [internal quotation marks omitted]). Thus, the § 46b-82 factors are intended to help the trial court determine, first, whether alimony is necessary for the recipient's support and maintenance, and, second, if alimony is necessary, the amount and duration necessary to provide for the recipient's support and maintenance. The factors do not, however, transform alimony into something it is not. Stated differently, the factors are not to be utilized to justify an award that exceeds the purpose of alimony, namely, support and maintenance.

The alimony award is also justified, the majority suggests, due to the disparity in the premarital agreement's distribution of the marital assets. The majority emphasizes that the defendant received more than $25 million in assets as a result of the divorce, compared to the approximately $4.5 to $5 million in assets that the plaintiff received.[21] To support its suggestion that the alimony award is proper in light of the premarital agreement's comparative property distribution, the majority cites § 46b-82, particularly, the factor directing the trial court to consider the estate of each party. Section 46b-82 provides no support for this approach. Indeed, the court must consider the estate of both spouses. Consideration of the estate of the alimony obligor is necessary to determine his or her ability to pay alimony, and, likewise, consideration of the estate of the alimony recipient is necessary to determine his or her need for

alimony. Considering the estates of the parties in a relative fashion, as the majority does in the present case, however, is an entirely different application of that factor. The majority's suggestion that a large lump sum alimony award, one not necessary to provide for the recipient's support and maintenance, might be justified due to the comparative share of the assets received by each spouse in accordance with a premarital agreement is entirely antithetical to the concept of such agreements. In fact, approving a $7.5 million lump sum alimony award because the parties' premarital agreement awarded the obligor $25 million in assets and the recipient between $4.5 and $5 million in assets is simply an attempt by the court to rewrite the parties' agreement. Our case law makes clear that the courts are not to second-guess the wisdom or question the fairness of premarital agreements that are entered into voluntarily. Cf. *Crews* v. *Crews*, 295 Conn. 153, 167, 989 A.2d 1060 (2010) ("whether the trial court or this court thinks the [premarital] agreement was a good bargain for the plaintiff does not enter into the analysis of [its enforceability]").

In a final attempt to justify the lump sum alimony award in the present case, the majority claims that the trial court did not specify how much of the unallocated alimony and child support award was intended for the children's support, rather than the plaintiff's. Although the trial court did not expressly state what the child support award amount was, we are not without guidance. Using the trial court's findings in the present case and the Child Support and Arrearage Guidelines (guidelines) in effect at the time of the dissolution, we can, at the very least, determine the baseline for child support. To assist courts in calculating equitable and consistent child support orders, the guidelines contain a schedule of basic child support obligations based on the number of children and the parents' combined net weekly income. See Regs., Conn. State Agencies § 46b-215a-2b (f).[22] In the present case, the parties have four minor children and a combined net weekly income of $12,097. For families with four minor children, however, the schedule only provides basic child support obligations for families with a combined net weekly income ranging between $370 and $4000. See id. "When the parents' combined net weekly income exceeds [$4000], child support awards shall be determined on a case-by-case basis, and the current support prescribed at the [$4000] net weekly income level shall be the minimum presumptive amount." Id., § 46b-215a-2b (a) (2). In accordance with the guidelines, therefore, the presumptive minimum child support obligation in the present case is $765 per week.[23] In *Maturo* v. *Maturo*, 296 Conn. 80, 995 A.2d 1 (2010), this court explained that, when a trial court is making a case specific child support determination for a family with a combined net weekly income that exceeds the upper range of the schedule,

it must still follow the principle on which the guidelines are based, namely, "that the child support obligation as a percentage of the combined net weekly income should decline as the income level rises." Id., 95. Thus, the rule to be gleaned from *Maturo* is that the minimum child support order in high income cases should presumptively be no less than "the current support prescribed at the [$4000] net weekly income level"; Regs., Conn. State Agencies § 46b-215a-2b (a) (2); for a family with the same number of minor children, and the presumptive maximum order should "not exceed the [maximum] percent [set forth in the schedule] when the combined net weekly income of the family exceeds $4000 . . . ." *Dowling* v. *Szymczak*, 309 Conn. 390, 401, 72 A.3d 1 (2013). With these principles in mind, I conclude that the presumptive appropriate range for the child support order in the present case is between $765 and $2314 per week—19.13 percent of the combined net weekly income. See id. (child support obligation for high income family should not exceed percent of combined net weekly income used for family with same number of minor children at highest combined net weekly income set forth in schedule); *Maturo* v. *Maturo*, supra, 96 (presumptively, support order for family with combined net weekly income in excess of income range covered by schedule should not exceed same percentage of income provided for family with same number of children and highest combined net weekly income provided by schedule); see also Regs., Conn. State Agencies § 46b-215a-2b (f) (setting child support obligation percentage for four minor children and combined net weekly income of $4000 at 19.13 percent). Thus, the presumptive maximum monthly child support, about $10,000, accounts for only a small amount of the excessive alimony. Even if it is assumed that the trial court found it necessary to deviate upward, there is no evidence in the record that would support the magnitude of the excessiveness of the award in the present case. Moreover, and as I explained in response to the plaintiff's argument on this point, the plaintiff's financial affidavit contains significant costs related to child care. Thus, simply stacking the presumptive child support amount on top of the expenses that the plaintiff listed in her financial affidavit would likely result in the double counting of some costs. Furthermore, the defendant is obligated to pay, in addition to the alimony and child support award, a substantial portion of the child care expenses, including health and dental insurance, 60 percent of unreimbursed medical and dental expenses, and one half of the expenses from the children's extracurricular activities.

Because the monthly alimony obligation of $102,500 unreasonably exceeds the plaintiff's monthly support need of $45,000, and despite the arguments advanced by the plaintiff and the majority, I conclude that the lump sum alimony award, in conjunction with the peri-

odic alimony award, is excessive. I concede, however, that this fact alone does not make the lump sum alimony award a functional property distribution. Indeed, for the alimony award to function as a property distribution, it must result in the transfer to the plaintiff of property that the defendant was awarded pursuant to the premarital agreement. The lump sum alimony award in the present case results in such a transfer.[24]

The defendant has a monthly income of approximately $80,833. The alimony obligation, however, is $102,500 per month. Thus, the defendant's monthly income is insufficient to satisfy the monthly alimony obligation, and, therefore, the defendant will necessarily need to invade his assets—assets that he was awarded under the premarital agreement—to cover the balance of the obligation, nearly $22,000 per month. Of course, the need to invade assets, in and of itself, does not make the lump sum alimony award a functional property distribution. See *Simms* v. *Simms*, supra, 283 Conn. 505 (trial court is not without authority to order alimony simply because such order would require obligor to invade his or her assets); see also *Brody* v. *Brody*, 136 Conn. App. 773, 790, 51 A.3d 1121 (2012) ("The defendant may elect to pay the [lump sum alimony] award out of his separate assets, but how he chooses to satisfy his obligation under the court's order is his decision. The court did not order him to pay the award out of his separate assets. That he plans to do so does not invalidate an otherwise valid award of alimony."), rev'd in part on other grounds, 315 Conn. 300, 105 A.3d 887 (2015). When an alimony award is necessary to provide for the support and maintenance of the recipient, the fact that the obligor needs to invade his or her assets to satisfy the obligation does not change the award's function, which is to provide support and maintenance. On the other hand, when an alimony award is excessive *and* requires the obligor to invade his or her assets to satisfy the obligation to pay the award, the function of the award changes. In this circumstance, the obligor is forced to transfer assets to the recipient, assets that the obligor was awarded in the dissolution proceeding and that are unnecessary for the support and maintenance of the recipient.

In the present case, the alimony order results in the plaintiff receiving at least $6.9 million in excess of her support and maintenance needs. Thus, the award goes beyond the purpose of alimony. Moreover, the award is nearly 127 percent of the defendant's monthly income, and, therefore, he will need to invade his assets to satisfy the court order. Thus, under the trial court's current financial support orders, the defendant must transfer to the plaintiff assets that he was awarded under the premarital agreement, assets that are *unnecessary* for the plaintiff's support and maintenance. The only logical conclusion is that the trial court has effectuated, whether intentional or not, a transfer of the defen-

dant's assets to the plaintiff, contrary to the intention of the parties as represented in their premarital agreement.[25] I thus conclude that the lump sum alimony award in the present case is a functional property distribution.[26]

The analysis employed in this case is consistent with the development of matrimonial law in other jurisdictions. Courts in Florida and South Dakota agree that premarital agreements limit the discretion of dissolution courts. See *Hannon* v. *Hannon*, supra, 740 So. 2d 1187 ("A primary purpose of [a premarital] agreement is to modify or shrink the general discretion of the dissolution . . . [court] in doing equity between the parties. The agreement itself is intended to define the mutual equities, and the [dissolution court] is not free to ignore its provisions or to render them ineffective. . . . Dissolution . . . courts should attempt to give effect to [premarital] agreements that are . . . properly made and fully enforceable."); *Walker* v. *Walker*, supra, 765 N.W.2d 754 (same). In *Hannon*, the husband, George Hannon, Sr., and the wife, Lorain A. Hannon, entered into a premarital agreement, pursuant to which each waived any interest in the separate property of the other, including any rights they might have as a surviving spouse. *Hannon* v. *Hannon*, supra, 1182–83. The agreement also provided that the husband promised "to support [the wife] during their marriage in a manner [that] is consistent with the standard of living of [the husband] from time to time during their marriage," but it did not address alimony. (Internal quotation marks omitted.) Id., 1183. The parties divorced, and the husband challenged the trial court's lump sum alimony award of $92,736. Id. He argued that the award was, in effect, a property distribution because his separate property was the only source from which he could pay the lump sum alimony award. See id. The Florida District Court of Appeal overturned the lump sum alimony award. See id., 1188. The court recognized that the wife could receive lump sum alimony despite having waived any rights in the husband's separate property. See id. Nevertheless, the court stated that "the [premarital] agreement cannot be treated as though it has no limiting effect on the power of the trial [court] to award lump sum alimony. Any such award must be carefully restricted in its amount so that it does not appear to contradict the terms of the [premarital agreement]." Id. The court concluded that the agreement demonstrated the parties' intent to waive any interest in the property of the other, both during their lifetimes and after death, and the husband's intent to support the wife during *his* lifetime only. Thus, the court further concluded that the lump sum alimony award was improper in light of the agreement because it was based on the wife's, rather than the husband's, life expectancy. Id.

In *Walker*, the wife, Debra Sue Walker, and the husband, Edward Walker, Jr., entered into a similar agree-

ment in that each waived any right or interest in the premarital property of the other. See *Walker* v. *Walker*, supra, 765 N.W.2d 749. When the parties divorced, the trial court denied the husband's request for lump sum alimony because the court found that he had not established a need for the alimony or the wife's ability to pay alimony. Id., 753. The husband appealed, claiming that the trial court failed to consider the wife's premarital assets in assessing her ability to satisfy a lump sum alimony obligation. Id. The South Dakota Supreme Court characterized the husband's claim as an attempt to effectively nullify the premarital agreement and concluded that, in light of such agreement, the trial court could not consider the wife's premarital assets, valued at nearly $630,000, as a source of funds for a lump sum alimony award because the husband had waived any right to such funds. See id., 754.

Even if the lump sum alimony award in the present case was not a functional property distribution, I would still find it to be improper under the circumstances. As I already discussed, the award far exceeds the plaintiff's needs for support and maintenance. For that reason alone, I believe it undermines the premarital agreement.

When the parties agreed to allow the court to set alimony in the event of a divorce, they intended for the court to award an amount that would provide for the recipient spouse's support; after all, that is what alimony is. According to the plaintiff's own financial affidavit, that amount is approximately $45,000 per month. When the trial court entered an order requiring the defendant to pay alimony in considerable excess of the plaintiff's needs, the order provided the plaintiff with a windfall that was not contemplated by the parties' premarital agreement. In doing so, the trial court defeated that agreement.[27] When the premarital agreement in the present case was executed, as amended, the plaintiff and the defendant intended that, if their marriage were to be dissolved, each would keep his or her own separate property, the defendant would keep the marital property and, in exchange, the plaintiff would receive a property settlement payment, which increased with the length of the marriage and the number of children, and the court would set an alimony award. Because the purpose of alimony is to provide support and maintenance, at the time of dissolution, the alimony award the parties had bargained for was approximately $45,000 per month. Of course, the award need not be that amount exactly and could be in lump sum, rather than periodic, form. The trial court, however, awarded more than twice that amount. That is not what the parties bargained for. Thus, the court's alimony award is improper and undermines the premarital agreement because it exceeds the plaintiff's support and maintenance needs beyond all reasonable bounds.

In light of the foregoing facts, I conclude that the lump

sum alimony award in the present case is a functional property distribution because it far exceeds the plaintiff's need for support and requires the defendant to invade assets to satisfy the obligation. The lump sum alimony award is also improper because the parties' bargain allowed for the court to set alimony—an award that would provide for the support and maintenance of the recipient. The award in this case goes far beyond that purpose. Moreover, "[b]ecause the financial orders in an action for dissolution of marriage are of necessity interwoven and because the rendering of judgment in an action for the dissolution of marriage is a carefully crafted mosaic . . . each element of which may be dependent on the other"; (internal quotation marks omitted) *Wiegand* v. *Wiegand*, 129 Conn. App. 526, 540, 21 A.3d 489 (2011); the defendant's second claim regarding attorney's fees is affected by the trial court's improper lump sum alimony award. Accordingly, I need not consider that claim. See id. Instead, I would reverse the judgment of the trial court with respect to the financial orders and remand the case for a new hearing on the financial matters.

In sum, I reiterate my concern with the practical consequences that are likely to follow from the majority's opinion in the present case. In light of that opinion, trial courts can effectively undermine premarital agreements entered into by prospective spouses by making excessive alimony awards.[28] As a result, I fear that parties will be encouraged to include in their premarital agreements provisions either establishing alimony, by amount or formula, or precluding it altogether. Although the public policy of this state generally favors the private settlement of family matters; see, e.g., *Billington* v. *Billington*, supra, 220 Conn. 221; and alimony is a permissible subject matter for premarital agreements; General Statutes § 46b-36d (a) (4) (parties to premarital agreement may contract with respect to "[t]he modification or elimination of spousal support"); in my view, alimony is more appropriately settled at the time of dissolution, when the obligor's ability to pay and the recipient's support needs are both known, rather than at some time before the marriage, when these relevant considerations are uncertain.

## II

## ENFORCEABILITY OF PREMARITAL AGREEMENT

The plaintiff filed a cross appeal challenging the enforceability of the premarital agreement. Her appeal, however, was contingent on the defendant prevailing on his claims or this court otherwise remanding the case for the entry of new financial orders. Because I would reverse the trial court's financial orders and remand the case for a new hearing on the financial matters, I reach the plaintiff's cross appeal. The plaintiff claims that the trial court incorrectly concluded that the premarital agreement entered into by the parties in

1997, and amended in 2008, was enforceable. In essence, she argues that the agreement is unenforceable because (1) the defendant did not make a fair and reasonable disclosure of his income when the agreement was amended in 2008, (2) the defendant did not make a fair and reasonable disclosure of the value of certain software in which he had a proprietary interest when the parties married, and (3) the agreement was unconscionable when entered into in 1997, when amended in 2008, and when the defendant sought enforcement of the agreement in 2014. I agree that the defendant did not make a fair and reasonable disclosure of his income in 2008, when he and the plaintiff amended the premarital agreement, and, therefore, I need not address the plaintiff's other arguments. In light of the defendant's unfair and unreasonable disclosure of his income, I conclude that it was improper for the trial court to enforce the amended agreement.

The following facts are relevant to this claim. The plaintiff and the defendant executed a premarital agreement on July 14, 1997, approximately three weeks before they were married. As I previously noted, the agreement provided that, in the event of dissolution of the marriage, each party would retain their separate property, the defendant would retain the marital property, with the exception of certain personal property, and the plaintiff would receive a property settlement payment, which increased with the length of the marriage and the number of children. Both parties made financial disclosures in connection with the agreement, including a disclosure by the defendant of his proprietary interest in a certain software program. At that time, the defendant valued that interest at between $285,000 and $570,000. Within three years of marrying, the defendant sold the software and received approximately $37 million for his interest in it.

In July, 2008, the parties amended their premarital agreement. The amendment ratified and confirmed the terms of the original agreement. In addition, it granted the plaintiff a separate interest in the marital home and provided that, in the event of a legal separation or a divorce, the plaintiff would receive $3.5 million for such interest, along with any payment due pursuant to the formula set forth in the original agreement. The parties again made financial disclosures in connection with the amendment. Among other things, the defendant listed his taxable income for 2004, 2005, and 2006 in the amounts of $1,249,989, $902,025, and $1,687,677, respectively. He did not, however, disclose his 2007 income or his income in 2008 as of the date of the amendment, namely, July 10.

I will begin with the standard of review and governing legal principles. A trial court's determination of whether a premarital agreement is unenforceable under § 46b-36g is a mixed question of fact and law, and, therefore,

this court's review of such determination is plenary. E.g., *Friezo* v. *Friezo*, 281 Conn. 166, 180, 914 A.2d 533 (2007). Thus, I must decide whether the trial court's "conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) Id., 181.

Premarital agreements entered into on or after October 1, 1995, such as the agreement in the present case, are governed by the Connecticut Premarital Agreement Act (act), General Statutes § 46b-36a et seq.[29] See P.A. 95-170, §§ 10 and 11 (act applies to premarital agreements executed on or after October 1, 1995). Under the act, a premarital agreement or amendment thereto is unenforceable "if the party against whom enforcement is sought proves that: (1) [s]uch party did not execute the agreement voluntarily; or (2) [t]he agreement was unconscionable when it was executed or when enforcement is sought; or (3) [b]efore execution of the agreement, such party was not provided a fair and reasonable disclosure of the amount, character and value of property, financial obligations and income of the other party; or (4) [s]uch party was not afforded a reasonable opportunity to consult with independent counsel." General Statutes § 46b-36g (a).

The plaintiff contends, among other things, that the defendant's financial disclosure in connection with the 2008 amendment to the premarital agreement was not fair and reasonable because he did not disclose his 2007 and 2008 income. In response, the defendant argues that he provided the plaintiff with a three year income history, including 2004, 2005, and 2006. He further contends that he generally does not know his exact annual income until he has filed his income tax returns and that, as of July, 2008, he had not filed his 2007 income tax return; therefore, he could not have disclosed his 2007 and 2008 income at the time the parties amended their premarital agreement. Under these circumstances, the defendant claims that his financial disclosure was fair and reasonable.[30]

*Friezo* is our seminal, and only, case addressing what constitutes a fair and reasonable disclosure under § 46b-36g (a) (3). In that case, we began by noting that the question was a matter of statutory interpretation, and, as such, we first looked to the plain meaning of the statutory text. *Friezo* v. *Friezo*, supra, 281 Conn. 180, 182. Although "fair and reasonable" is not defined in § 46b-36g (a) (3), we concluded that it "was intended to be understood in the context of the phrase that directly follows, namely, 'the amount, character and value of property, financial obligations and income of the other party . . . .' General Statutes § 46b-36g (a) (3). Accordingly, 'fair and reasonable' disclosure refers to the nature, extent and accuracy of the information to be disclosed . . . ." *Friezo* v. *Friezo*, supra, 182–83.

Finding no further guidance in the text of the statute,

we turned to the legislative history. See id., 183. The legislative history revealed that the act had been influenced by three things: this court's decision in *McHugh* v. *McHugh*, 181 Conn. 482, 436 A.2d 8 (1980), the Uniform Premarital Agreement Act, and a law review article written by Professor Judith T. Younger, J. Younger, "Perspectives on Antenuptial Agreements," 40 Rutgers L. Rev. 1059 (1988). *Friezo* v. *Friezo*, supra, 281 Conn. 183–84. Our review of the legislative history also uncovered that the original bill made it more difficult to challenge the enforceability of a premarital agreement on the ground that the financial disclosure was not fair and reasonable. Id., 185. Under the terms of that bill, in addition to establishing that the disclosure was unfair and unreasonable, the challenging party was required to show that he or she had not waived such a disclosure and did not have, or reasonably could not have had, adequate knowledge of the other party's property, income, and financial obligations. Id. The removal of the latter two requirements, we reasoned, not only made it easier to establish that a financial disclosure was not fair and reasonable, but also demonstrated that the legislature intended the requirement to focus on the information disclosed rather than on the party to whom disclosure was made. Id.

Finally, we considered the case law of this and other jurisdictions. We began with *McHugh*, noting that the act was intended to clarify and not supplant it. Id., 185–86 and n.23. *McHugh* was the first case in our modern history to consider the enforceability of a premarital agreement. *McHugh* v. *McHugh*, supra, 181 Conn. 485. In that case, we concluded that a premarital agreement is enforceable if, among other things, each party discloses to the other "the amount, character, and value of individually owned property . . . ." Id., 486. The duty is one of disclosure and not of inquiry, we noted, for that is the only way in which a court can ensure that the parties have intelligently waived their statutory rights. See id., 486–87. Moreover, because prospective spouses are in a confidential relationship, each must exercise good faith, candor, and sincerity in matters bearing on the agreement. Id., 487. In *Friezo*, we gleaned three important points from *McHugh*: "First, the purpose of disclosure is to ensure that each party has sufficient knowledge of the other party's financial circumstances to understand the nature of the legal rights being waived. . . . Second, financial disclosure in Connecticut must be understood as a burden to inform borne solely by the disclosing party. . . . Third, full financial disclosure is required in a [premarital] agreement only if the party to whom disclosure is made does not have independent knowledge of the other party's financial circumstances." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Friezo* v. *Friezo*, supra, 281 Conn. 186–87.

After reviewing cases from other jurisdictions, we

agreed with the position taken by a majority of other states, which was consistent with *McHugh* and our reading of the statute. See id., 188–91. "[A] fair and reasonable financial disclosure requires each contracting party to provide the other with a general approximation of [his or her] income, assets and liabilities . . . ." Id., 191.

After determining the meaning of "fair and reasonable," we turned to the facts in *Friezo*. See id., 191–93. In *Friezo*, the trial court had found that the husband's financial disclosure was not fair and reasonable because the wife was not provided sufficient time to examine the disclosure and lacked sufficient knowledge to understand the disclosure. See id., 179, 192. It did not find, however, that the disclosure was inaccurate or incomplete, nor did the wife make any such allegations. See id., 192. Ultimately, this court concluded that the husband's financial disclosure in *Friezo* was fair and reasonable because the standard is concerned with the content of the disclosure rather than the timing of the disclosure or the receiving party's capacity to understand the disclosure.[31] See id., 183, 191–93. The content of the husband's disclosure, we concluded, was adequate. See id., 191. When the husband and the wife entered into the agreement in November, 1998, the husband disclosed his 1997 gross income, excluding capital gains, and he provided a list of assets and liabilities, including individual values with respect to most items. Id.

Although this court has not had the opportunity to revisit this issue since *Friezo*, the Appellate Court has twice addressed the question of fair and reasonable disclosure under § 46b-36g (a) (3) since this court's decision in *Friezo*. See *Beyor* v. *Beyor*, 158 Conn. App. 752, 762–65, 121 A.3d 734, cert. denied, 319 Conn. 933, 125 A.3d 206 (2015); *Oldani* v. *Oldani*, 132 Conn. App. 609, 615–24, 34 A.3d 407 (2011), overruled in part on other grounds sub silentio by *Brody* v. *Brody*, 315 Conn. 300, 105 A.3d 887 (2015). The Appellate Court first applied *Friezo* in *Oldani*. In that case, the defendant, the wife, appealed from the trial court's decision enforcing the premarital agreement that she had entered into with the plaintiff, the husband. See *Oldani* v. *Oldani*, supra, 610. The wife argued, among other things, that the husband did not make a fair and reasonable financial disclosure. Id., 614. Both parties executed a premarital agreement in December, 2002; id., 612; and, prior to signing the agreement, they exchanged written financial disclosures. Id., 619. The husband's disclosure was dated May 1, 2002, and the trial court credited his testimony that the May, 2002 information was reliable as of December, 2002. Id., 619 n.7. The disclosure listed the husband's assets and liabilities and included certain schedules. Id., 619. One schedule contained information regarding the husband's interest in certain commercial and residential real estate, including, among other

things, his percentage of ownership, and the annual gross rents, operating expenses, and net operating income for each property, where applicable. See id., 620. The disclosure did not specifically state the husband's income. Id. Nonetheless, the trial court found that the disclosure was adequate because it provided sufficient information from which to determine the husband's income and to ensure that the wife's waiver of her statutory rights was intelligent. Id.

The Appellate Court disagreed, however, and determined that the husband's disclosure was not fair and reasonable. Id., 616; see id., 624. That court reasoned that the real estate schedule did not expressly identify the net income that the husband received or was entitled to receive, and it did not provide the wife with a formula or other information directing her on how she might determine his share of the rental income. Id., 621. Moreover, the husband conceded at trial that not all the necessary information was provided to accurately calculate the income that he would receive from the rental properties. Id. For example, he testified that there is often a holdback of rental income, but the schedule did not provide any information regarding holdbacks. Id. Finally, the Appellate Court concluded that the trial court had incorrectly concluded that the husband's additional sources of income, such as consulting fees, distributions, and interest and dividend income, were irrelevant to the validity of his disclosure and improperly considered the wife's motive for signing the premarital agreement in assessing the fairness and reasonableness of the husband's disclosure. See id., 622–23. In light of these facts, the Appellate Court concluded that, although the husband may have provided a fair and reasonable disclosure of his assets, he failed to make such a disclosure of his income. See id., 624.

The Appellate Court next considered this question in *Beyor* v. *Beyor*, supra, 158 Conn. App. 752. The defendant, the wife, appealed from the judgment of the trial court, which enforced the premarital agreement that she entered into with the plaintiff, the husband. Id., 754. The parties entered into the agreement in August, 2006, waiving any claims that they might have had in each other's property and any right to receive alimony or support in the event of a divorce. Id. On appeal, the wife argued that the premarital agreement was unenforceable because, among other things, the husband's financial disclosure was not adequate. Id., 762. Specifically, she contended that his disclosure omitted his Internal Revenue Service "Schedule E income,"[32] which was $394,048 in 2006, and that such an omission required a finding that the disclosure was not fair and reasonable under *Oldani*. Id. The Appellate Court disagreed. See id., 765. The court distinguished *Oldani* by noting that, in *Oldani*, the husband did not list any income, the parties had a minor child, and the premarital agreement provided for some alimony. Id., 764. The

court noted that that was unlike the facts in *Beyor* because the husband in *Beyor* had disclosed the amount, character, and value of property, financial obligations, and income, excluding the Schedule E income, the parties had no children, and the parties waived all rights to alimony in the premarital agreement. Id. Thus, the Appellate Court reasoned that the wife knew going into the marriage that the husband had substantially more financial worth than her and that she would not be entitled to any of it if they divorced. Id., 764–65. Moreover, the court noted that, although the husband did not disclose his Schedule E income, he did disclose the sources of such income, his interest in those sources, and the value of those sources. See id., 765. I am convinced that *Beyor* was incorrectly decided, and, therefore, I will not apply its reasoning to the present case.[33]

With this background in mind, I turn to the present case. I begin by noting that what is a fair and reasonable financial disclosure under § 46b-36g (a) (3) depends on the facts and circumstances of the case. It is undisputed in the present case that the defendant did not disclose his 2007 and 2008 income when he and the plaintiff entered into the July, 2008 amendment to the premarital agreement. In light of this, I conclude that the defendant, like the husband in *Oldani*, failed to make a fair and reasonable disclosure of his income in 2008. In *Oldani*, the Appellate Court held that the disclosure in question was not fair and reasonable because, although the husband disclosed his interests in certain real estate and the net operating income generated by such real estate—which arguably could provide a general picture of his income—he did not expressly disclose his income, did not provide information on how to calculate his income, and did not disclose all the information necessary to accurately estimate his income. See *Oldani* v. *Oldani*, supra, 132 Conn. App. 619–21. In the present case, not only did the defendant fail to disclose his 2007 and 2008 income, but he did not even provide information from which an estimate of his income for those years could be derived. The defendant might argue that an estimated income for 2007 and 2008 could be derived by averaging the historical income data. This argument is unavailing, however, given the fluctuating nature of his income, which varied by nearly 50 percent over the three years disclosed.

The defendant argues that he disclosed three years of historical income and that such a disclosure was sufficient to provide the plaintiff with a "general approximation" of his income. (Emphasis omitted; internal quotation marks omitted.) A disclosure of historical income information, however, does not provide a general approximation of the defendant's *current* income.[34] I conclude that a fair and reasonable disclosure requires the disclosing party to divulge his or her current income. This is consistent with the purpose of the disclosure

requirement. As I noted previously, the purpose of the disclosure requirement "is to ensure that each party has sufficient knowledge of the other party's financial circumstances to understand the nature of the legal rights being waived. . . . In other words, a party cannot know what is being waived unless he or she is privy to all of the relevant facts, in particular, the financial status of the other party." (Citation omitted; footnote omitted.) *Friezo* v. *Friezo*, supra, 281 Conn. 186–87. Providing historical, rather than current, income information does not provide the party receiving such disclosure with accurate knowledge of the discloser's income at the time the agreement is being executed and, therefore, prevents the receiving party from intelligently waiving his or her statutory rights. Receiving current income information is particularly important in cases, like the present case, in which the receiving party is waiving equitable distribution of property and receiving a right to alimony. The party waiving equitable distribution in exchange for alimony undoubtedly relies on the income disclosure of the opposing party in assessing whether he or she agrees with the terms of the premarital agreement. Moreover, under the facts of the present case, the defendant's disclosure of his 2007 and 2008 income was important given the fluctuating nature of his income. See footnote 34 of this opinion. The defendant's disclosure in connection with the 2008 amendment to the premarital agreement and his testimony at trial revealed that he had variable income. His income for the years 2004, 2005, 2006, 2007, and 2008 was $1,249,989, $902,025, $1,687,677, $1,253,766, and $575,266, respectively. Knowledge of such variable income would be necessary for an intelligent waiver of statutory rights, particularly when a party is to receive alimony, and, therefore, disclosure of both historical and current income is necessary for a fair and reasonable disclosure when the discloser's income fluctuates like the defendant's had in the present case.

The defendant also argues that he could not have disclosed his 2007 and 2008 income when the parties executed the 2008 amendment because he did not have the tax information for those periods at that time and, thus, was not aware of his precise income for those tax years. This argument is unavailing. First, as the defendant has acknowledged, an exact disclosure of his income is not necessary. Indeed, all that is required for a fair and reasonable financial disclosure is that the defendant provide the plaintiff with "a general approximation of [his] income, assets and liabilities . . . ." *Friezo* v. *Friezo*, supra, 281 Conn. 191. Thus, he need not wait until his income tax returns are filed in order to make an exact disclosure. He can instead provide an accurate and reasonable estimate of his income. Moreover, there can be no doubt that, by July, 2008, he had some general idea of the income he had received in 2007 and the income he had received during the first

half of 2008. Second, at trial, the plaintiff claimed that it was improper for the defendant to value the assets in his financial disclosure as of December 31, 2007, when he had available valuations for those assets that were contemporaneous with the execution of the amendment to the premarital agreement in July, 2008. Although the trial court did not find the use of the six month old valuations fatal, and I express no opinion on that issue, it did note that "the evidence supports a finding that the [defendant] actually had available virtually all [of] the asset figures on a contemporaneous basis, *and, by inference, his income figures as well.*" (Emphasis added.) Thus, it appears, despite the defendant's contention, that he would have been able to provide income estimates for 2007 and 2008 when the parties amended their premarital agreement.

Finally, the defendant contends that, if he had provided a "snapshot" of his 2008 income at the time the parties amended their premarital agreement, and had that snapshot turned out to be substantially higher than his actual 2008 income, the plaintiff would still be challenging the accuracy of his disclosure. Even if that were true, it does not excuse him from making such a disclosure. The defendant had a duty to disclose information that would provide the plaintiff with a general approximation of his income. If, for whatever reason, the disclosure subsequently appeared to the plaintiff to be inconsistent with the defendant's actual 2008 income, and she wanted to challenge the accuracy of such disclosure, that is her prerogative. In such a case, she would carry the burden of establishing that the disclosure was inaccurate when it was made. See General Statutes § 46b-36g (a) (allocating burden of establishing unenforceability of premarital agreement to party against whom its enforcement is sought).

In sum, the defendant did not make a fair and reasonable financial disclosure when the parties executed the 2008 amendment to their 1997 premarital agreement, and I therefore conclude, pursuant to § 46b-36g (a), that their amended premarital agreement is unenforceable.[35] Thus, I would reverse the judgment of the trial court insofar as the trial court enforced that agreement.

For the foregoing reasons, I respectfully dissent.

[1] The trial court in the present case determined that the parties' premarital agreement is enforceable. Because the challenge by the plaintiff, Marjorie Hornung, to the trial court's enforcement of the premarital agreement is contingent on whether the defendant, Robert Hornung, prevails on appeal; see footnote 2 of the majority opinion; I assume, for purposes of the defendant's challenge to the lump sum alimony award, that the parties' premarital agreement is enforceable.

[2] One would think that this court would encourage prospective spouses to leave issues of alimony open for the courts. When a couple begins their marital journey, there is no way of knowing what life has in store. The couple may live happily together until death, divorce after twenty years, or their marriage may last mere months. Serious illness may befall one spouse and fame and fortune the other. They may have no children or four children. The possibilities are endless, and the needs of the potential alimony recipient are unknowable. But, instead, the majority encourages the settlement of

alimony issues before any couple weds because leaving alimony awards to the court, as the present case demonstrates, may result in a circumvention of the property division that the parties reached in their premarital agreement.

[3] The defendant also argues that the lump sum alimony award is a functional property distribution because (1) the trial court relied, in part, on the plaintiff's ability to acquire assets in the future and her contributions during the marriage to the acquisition, maintenance, and preservation of assets, which are both criteria set forth in the property division statute, General Statutes § 46b-81 (c), (2) the premarital agreement restricted the court's ability to consider additional equitable factors, and, thus, the plaintiff's contribution to the family assets and ability to acquire future assets were not appropriate additional factors for the court to consider under *Borkowski* v. *Borkowski*, 228 Conn. 729, 743–44, 638 A.2d 1060 (1994), (3) the court's comments that the defendant's insistence on entering into a premarital agreement contributed to the breakdown of the marriage and that the defendant offered the minimum he could to the plaintiff demonstrate that the court felt it would be equitable to provide additional funds to the plaintiff, and (4) the court's order that the lump sum alimony be nonmodifiable, survive the death of either party or remarriage of the plaintiff, and be nontaxable to the plaintiff and nondeductible to the defendant reveals its true character, namely, that it is a property award. In light of my conclusion, I need not address these additional arguments.

Additionally, the defendant claims that the trial court "expressly considered equitable factors such as the parties' children, even though the premarital agreement expressly contemplated children and provided for an increased property award in that event." I am not sure how consideration of the parties' children demonstrates that the alimony award is a functional property distribution. Moreover, it is unclear why a court's consideration of the minor children in awarding support to a custodial parent would be improper. It is true that the formula for dividing marital property in the premarital agreement contemplated the children. That does not, however, foreclose consideration of the same factor when support determinations are made. Indeed, General Statutes § 46b-82 (a) requires that the court consider, "in the case of a parent to whom the custody of minor children has been awarded, the desirability and feasibility of such parent's securing employment." In any event, the existence of children seems like an *appropriate* additional factor for the court to consider in determining the type, amount, and duration of an alimony award, even when such factor is also accounted for in a premarital agreement that governs the division of property. See *Borkowski* v. *Borkowski*, supra, 228 Conn. 743–44 (when entering financial orders in dissolution action, court, "in the exercise of its inherent equitable powers . . . may also consider any other factors [that] may be appropriate for a just and equitable resolution of the marital dispute" [internal quotation marks omitted]).

[4] Because I would reverse the trial court's financial orders, insofar as the plaintiff was awarded $7.5 million in lump sum alimony, and remand the case for a new hearing regarding the financial matters, I must also address the plaintiff's contingent appeal regarding the enforceability of the premarital agreement. See footnote 2 of the majority opinion. I address that issue in part II of this opinion.

[5] The agreement contained additional terms that are not relevant to this appeal.

[6] In its periodic unallocated alimony and support order, the trial court stated: "It is the . . . intention of [the] court that . . . the amount of alimony shall be nonmodifiable by the [defendant] where the sole basis for the modification is the annual gross earnings of the [plaintiff] of [$50,000] or less." In essence, this order creates a safe harbor for the first $50,000 of the plaintiff's annual income. Stated differently, the plaintiff's income cannot constitute a substantial change in circumstances, necessary to modify an alimony award, until it exceeds $50,000 per year. See General Statutes § 46b-86 (a) ("any final order for the periodic payment of permanent alimony or support . . . may, at any time thereafter, be continued, set aside, altered or modified by the court upon a showing of a substantial change in the circumstances of either party").

[7] In March, 2014, when the trial court issued its memorandum of decision in the present case, the parties' four children were fifteen, thirteen, twelve, and nine, respectively. Thus, by the time the defendant has paid the last installment of the lump sum alimony, the children will be approximately between twenty-five and nineteen years old.

[8] The convergence of *both* factors makes this purported alimony award

a functional property distribution. If the award was merely excessive, but did not require the defendant to invade assets to satisfy the obligation, it would not result in the transfer of property and, therefore, would not be a functional property distribution. That does not mean, however, that such an excessive award does not otherwise undermine the premarital agreement, as I subsequently explain in this opinion. Additionally, if the award required the defendant to invade assets but was not excessive, it would not be a functional property distribution because an award that does not exceed the recipient's support and maintenance needs comports with the purpose of alimony and thus functions as alimony.

[9] Alimony is intended to provide for the recipient's basic needs *and* to maintain the lifestyle that the recipient enjoyed throughout the marriage. See, e.g., *Brody* v. *Brody*, 315 Conn. 300, 313, 105 A.3d 887 (2015); *Dan* v. *Dan*, 315 Conn. 1, 10–11, 105 A.3d 118 (2014). Thus, my use of the words "expenses," "needs," and "support" throughout the remainder of this opinion encompasses both need and maintenance, and those words are used interchangeably.

[10] At the far end of the sliding scale, where the court's discretion is the narrowest, is the instance in which the parties have executed a premarital agreement that divides all the property, separate and marital, *and* sets alimony.

[11] For example, when the parties have not executed a premarital agreement, and the trial court possesses complete discretion to equitably divide the marital estate and to award alimony, the property distribution ordered by the court has the potential of impacting each spouse's respective needs and ability to pay alimony. To illustrate, assume that a marital estate includes an asset that produces significant income. Awarding such an asset to the alimony obligor impacts his or her ability to satisfy an alimony obligation. If, instead, the asset is awarded to the alimony recipient, the asset would provide an income stream from which the recipient could provide for some, or perhaps all, of his or her support and maintenance needs, thereby impacting the necessary amount of alimony. When the parties have executed a premarital agreement, however, and have decided which spouse will receive the income producing asset, not only have they effectuated the property distribution, and consequently limited the trial court's discretion to divide the property, but they have also impacted the alimony obligor's ability to pay alimony and the alimony recipient's needs.

[12] The plaintiff submitted a financial affidavit to the trial court, outlining her monthly income and expenses. In that affidavit, she claimed monthly living expenses of $65,444, and, because the trial court did not make any particular findings regarding such expenses, I will accept the plaintiff's financial affidavit as true. Nevertheless, some adjustments to the affidavit are necessary. The plaintiff included what appear to be one time expenses, such as $11,787 for furniture, home furnishings, and home improvements, as well as $3750 for a Bat Mitzvah for one of the children. The affidavit also includes $6559 in monthly expenses arising from property the parties owned in Vermont, which was awarded to the defendant pursuant to the parties' premarital agreement. Removing these items from the plaintiff's monthly expenditures results in expenses totaling $43,348. This figure is consistent with the affidavit the plaintiff submitted in a posttrial proceeding, in which she outlined monthly living expenses totaling $44,332. For ease of calculation, I rounded the plaintiff's monthly support need to $45,000.

I note that, even with these adjustments, the plaintiff's monthly expenses are likely overstated. She claims $2712 in monthly medical expenses for both her and the children, and $6846 for the children's monthly expenses, including various extracurricular activities (this figure excludes the Bat Mitzvah expense previously discussed). The defendant, however, was ordered to pay one half of the costs for the children's camps, tutors, lessons, and extracurricular activities, and to provide for the children's health and dental insurance and to pay 60 percent of the unreimbursed medical and dental expenses. For a period of three years, the defendant also must pay the premiums for the plaintiff's continuing health insurance coverage, should she elect to obtain such coverage.

[13] Even if it is assumed that the plaintiff's periodic alimony and expenses remain unchanged, it appears, at first blush, that she will have a support deficit of $5000 a month, or $60,000 a year, for the five years after the lump sum alimony installments end in light of her estimated monthly support need of $45,000 per month and the court's award of $40,000 in monthly periodic alimony and support. A closer examination of her financial affidavit, however, reveals that the $40,000 in monthly periodic alimony will be more

than sufficient to cover her support needs when the lump sum alimony installments end. The plaintiff's monthly expenses include approximately $15,755 in expenses relating to the children. See footnote 15 of this opinion. As I previously noted, however, when the lump sum alimony payments end in 2024, the parties' children will have reached the age of majority. See footnote 7 of this opinion. Thus, the periodic alimony and support award of $40,000 per month, if unchanged, will provide the plaintiff with nearly $11,000 more in monthly support than she needs ($45,000 less $15,755 equals $29,245, which is approximately $11,000 less than the $40,000 monthly periodic alimony and support award).

[14] The plaintiff also argues that the lump sum alimony award is not a functional property distribution because the trial court unequivocally referred to the award as alimony and stated that the purpose of the award was for the support and maintenance of the plaintiff. The majority makes similar arguments. The mere labeling of the award as alimony and finding that the award "is appropriate to provide for [the] continuing support of the [plaintiff]" does not necessarily mean that the award was proper and did not function as a property distribution. Instead, the alimony award must *actually* be consistent with its purpose—support—and when the alimony award provides approximately $6.9 million more than the plaintiff needs for support, I cannot conclude that it comports with such a purpose.

[15] I question the extent to which the $40,000 periodic award is insufficient to provide for the *plaintiff's* needs because her financial affidavit includes numerous expenditures that relate to the children. The affidavit includes the following monthly expenses incurred for the children: restaurant costs ($851), medical, dental, and counseling costs ($949), clothing costs ($2851), personal care costs ($222), nanny and sitter costs ($4036), and lessons and extracurricular costs ($6846, excluding Bat Mitzvah costs). If these costs are subtracted from the plaintiff's expenses, as adjusted in this opinion (approximately $45,000), the plaintiff's monthly support need totals $29,245. Thus, the monthly unallocated alimony and child support award of $40,000 per month would completely provide for the plaintiff's needs and leave approximately $11,000 per month to defray child care costs.

[16] In addition, the lump sum alimony award is nonmodifiable. As a result, the defendant will be unable to modify the obligation as the children attain the age of majority. Of course, he can seek an adjustment to the periodic unallocated alimony and child support award pursuant to General Statutes § 46b-86.

[17] As I previously noted in this opinion, the plaintiff's stated need—$65,444—overstates her actual monthly support need—approximately $45,000. See footnotes 12, 13 and 15 of this opinion. In addition, there is no reason to believe that the plaintiff's financial affidavit does not reflect the expense of maintaining her current lifestyle. Surely, no one could reasonably argue that the stated monthly support need, or the support need as adjusted in this opinion, merely covers the *bare necessities*. Moreover, it is no doubt a truism that $102,500 exceeds both $65,444 and $45,000.

[18] The majority claims that it "make[s] no judgment as to the excessiveness or propriety of the alimony award as alimony." (Emphasis omitted.) Footnote 25 of the majority opinion. Instead, the majority insists that its consideration of the § 46b-82 factors supports "the characterization of the [lump sum] award as alimony and not a property distribution." Id. In my view, this reasoning is circular. If the majority, after considering the § 46b-82 factors, concludes that the lump sum award can fairly be characterized as alimony, then it must conclude that the award is a proper amount, not an excessive amount, for the support and maintenance of the plaintiff; after all, that is the character of alimony. Thus, at least in my view, the majority's conclusion that the lump sum award is characteristically alimony necessarily is a conclusion that the award is not excessive.

[19] We have defined the statutory factor of "station" in §§ 46b-81 and 46b-82 to mean standard of living. See, e.g., *Blake* v. *Blake*, 207 Conn. 217, 232, 541 A.2d 1201 (1988) ("The most pertinent definition of 'station' . . . is 'social standing.' A person's social standing is strongly correlated to his standard of living . . . .").

[20] A trial court must also consider an alimony obligor's ability to pay alimony and still provide for himself or herself. See *Greco* v. *Greco*, supra, 275 Conn. 361–62 ("[i]t is hornbook law that what a spouse can afford to pay for support and alimony is a material consideration in the court's determination as to what is a proper order" [internal quotation marks omitted]). In this regard, § 46b-82 (a) directs the court to consider "the age, health . . . occupation, amount and sources of income, earning capacity,

vocational skills, education, employability . . . and needs" of the obligor spouse.

[21] The plaintiff received a $4.75 million property settlement payment pursuant to the premarital agreement, as well as other personal property, such as home furnishings, an automobile or automobiles, personal savings, checking and money market accounts.

[22] Section 46b-215a-2b of the Regulations of Connecticut State Agencies was in effect in 2014, when the parties' marriage was dissolved. It was repealed July 1, 2015.

[23] In the present case, the trial court found that the presumptive minimum child support obligation is $795. This finding conflicts with the amount prescribed in the schedule for a family with four minor children and a combined net weekly income of $4000. See Regs., Conn. State Agencies § 46b-215a-2b (f) (setting presumptive minimum weekly child support obligation at $765 for combined net weekly income of $4000). I assume the discrepancy is a clerical error.

[24] The majority claims that it is improper to consider the defendant's need to invade his assets to meet the alimony obligation because (1) the defendant did not make this argument, and (2) the trial court made no finding regarding the defendant's earning capacity. See footnote 20 of the majority opinion. Both claims are unwarranted.

First, the defendant in the present case claims that the trial court's lump sum alimony award is an improper functional property distribution. In order to be a property distribution, the award must distribute some of the defendant's property to the plaintiff; therefore, necessarily subsumed in the defendant's claim is the argument that he will need to invade assets to satisfy the alimony award. Moreover, at oral argument in the present case, counsel for both the plaintiff and the defendant discussed the defendant's need to utilize assets to meet the alimony obligation and the impact, if any, that fact should have on this court's resolution of this case.

Even if I agreed that the defendant has not argued that he will need to invade his assets to satisfy the alimony obligation—which I do not—that would not prevent this court from considering such an argument in the present case. Indeed, this court generally will not consider claims that the parties have not raised; see, e.g., *State* v. *Connor*, 321 Conn. 350, 362, 138 A.3d 265 (2016) ("appellate courts generally do not consider issues that were not raised by the parties"); and this opinion is consistent with that principle. I have not addressed any *claim* that was not raised by the defendant. Instead, I have merely decided the specific *claim* asserted by the defendant, namely, that the lump sum alimony award is a functional property distribution, albeit, on the basis of a slightly different *argument* or *theory* than the defendant presented. See, e.g., *State* v. *Dickson*, 322 Conn. 410, 467 n.5, 141 A.3d 810 (2016) (*Zarella, J.*, concurring in the judgment) (noting that majority declined to adopt any of defendant's three alternatives for prescreening eyewitness identification testimony, opting instead to craft rule of its own creation); *Waterbury* v. *Washington*, 260 Conn. 506, 549, 800 A.2d 1102 (2002) (agreeing with plaintiff's *claim* but for *reasons* different from those that plaintiff advanced). It is not improper for me to consider the defendant's need to invade assets because "it is an *argument*, not a *claim*." (Emphasis in original.) *Michael T.* v. *Commissioner of Correction*, 319 Conn. 623, 635 n.7, 126 A.3d 558 (2015); see id. (this court may "review legal arguments that differ from those raised before the trial court if they are subsumed within or intertwined with arguments related to the legal claim raised at trial" [internal quotation marks omitted]). The majority's contrary assertion must be based on a misunderstanding of the argument-claim distinction. "Generally speaking, an argument is a point or line of reasoning made in support of a particular claim." *State* v. *Fernando A.*, 294 Conn. 1, 116 n.32, 981 A.2d 427 (2009) (*Palmer, J.*, dissenting in part). Arguments and claims are not subject to the same rules. See id. ("[o]nly claims are subject to our rules of preservation, not arguments"). Moreover, the defendant's claim raises an issue of first impression. Accordingly, it would be unfair and inequitable for this court to decline to address the claim fully simply because the defendant did not accurately foresee the exact argument on which the court would rest its decision. Cf. *Rowe* v. *Superior Court*, 289 Conn. 649, 661 n.6, 960 A.2d 256 (2008) (preservation rules are applied less stringently to arguments of first impression), overruled in part on other grounds by *Hardy* v. *Superior Court*, 305 Conn. 824, 48 A.3d 50 (2012). Insofar as the majority is concerned that it would be unfair or prejudicial to the plaintiff to decide the claim that the defendant raises, which is based, in part, on the argument that the defendant will need to invade his assets to satisfy the obligation, the proper remedy would be to order supplemental briefing, not to avoid fully addressing the defendant's claim. In fact, this court often orders supplemental briefing when it identifies

an argument that may impact the resolution of a claim raised by the parties. See, e.g., *State* v. *Wright*, 320 Conn. 781, 786–87, 135 A.3d 1 (2016) (defendant argued that trial court improperly excluded certain evidence under rape shield statute, and we ordered supplemental briefing regarding meaning of "material," as used in statute).

Second, the majority's assertion that "we cannot presume that [the defendant] *must* invade his assets to pay the alimony and child support awards based [on] this record . . . [because] the [trial] court did not make any determination as to whether its finding of the defendant's income was also a finding of his *earning capacity*" is inconsistent with our case law. (Emphasis in original.) Footnote 20 of the majority opinion. "It is well established that the trial court may under appropriate circumstances in a marital dissolution proceeding base financial awards . . . on the earning capacity of the parties rather than on actual earned income." (Internal quotation marks omitted.) *Tanzman* v. *Meurer*, 309 Conn. 105, 113–14, 70 A.3d 13 (2013). We have recently decided, however, "that, when a trial court has based a financial award pursuant to § 46b-82 or [General Statutes] § 46b-86 on a party's earning capacity, the court *must* determine the specific dollar amount of the party's earning capacity." (Emphasis added.) Id., 117; see also id. ("the failure to specify the dollar amount of the earning capacity leaves the relevant party in doubt as to what is expected from him or her, and makes it extremely difficult, if not impossible, both for a reviewing court to determine the reasonableness of the financial award and for the trial court in a subsequent proceeding on a motion for modification to determine whether there has been a substantial change in circumstances"). In light of this requirement, and because, as the majority acknowledges, the trial court made no finding regarding the defendant's earning capacity, the financial orders in the present case must be based on the defendant's actual income. Thus, the *reality* of the present case is that the trial court ordered an alimony award that exceeds the defendant's income, thereby requiring the defendant to invade his assets to satisfy the alimony and support obligation. The majority's *theoretical* argument that perhaps the defendant has a greater earning capacity and, therefore, could increase his income and avoid the need to utilize assets to meet the alimony obligation is misplaced. The trial court did not base its orders on such reasoning, and the orders should not be upheld on the basis of such reasoning. That the trial court did not impute income to the defendant evinces that the court concluded that the defendant is reasonably meeting his earning potential and should not be obligated to do better. The fact that, theoretically, the defendant may be able to generate a greater income does not mean that he should have to.

A recent decision of the Appellate Court is instructive. In *Dumbauld* v. *Dumbauld*, 163 Conn. App. 517, 523, 136 A.3d 669 (2016), the Appellate Court considered a pendente lite alimony award that exceeded the obligor's income and, as a result, had to be paid out of the obligor's assets. Acknowledging that alimony in excess of the obligor's income had been upheld in the past, the Appellate Court nevertheless concluded that the award was an improper property distribution. Id., 531. It reasoned that the cases permitting alimony in excess of net income were distinguishable on two grounds. See id., 527. First, in many cases, the court had found the obligor's evidence regarding his or her income to be untrustworthy and made specific findings as to either imputed income or earning capacity. Id. Second, those courts allowing alimony to be based on an ability to pay, rather than on imputed income, earning capacity, or actual income, had the authority, pursuant to § 46b-81, to divide property. Id., 529. The statute permitting pendente lite alimony, the court reasoned, did not authorize the court to transfer property between spouses. Id., 530. Thus, the Appellate Court concluded that the pendente lite alimony award was improper because it exceeded the income of the obligor, the trial court made no finding regarding imputed income, and the trial court was without authority to distribute property between the spouses. See id., 531. Similarly, in the present case, the alimony obligation exceeds the defendant's income, and the trial court has made no finding regarding imputed income or earning capacity. Moreover, the trial court had no authority to transfer property between the spouses because the spouses had executed a premarital agreement. Of course, a trial court may, when necessary for support and maintenance of the alimony recipient, require the obligor to pay alimony out of assets. *Simms* v. *Simms*, supra, 283 Conn. 505. As I discussed in this opinion, however, this is not such a case.

[25] The plaintiff and the majority assert that the trial court called the award alimony and stated it was for the support and maintenance of the plaintiff. Thus, they say, it cannot be a functional property distribution. I say, "[s]uppose you see a bird walking around in a farm yard. This bird has no label that says 'duck.' But the bird certainly looks like a duck. Also, he goes to

the pond and you notice he swims like a duck. Then he opens his beak and quacks like a duck. Well, by this time you have probably reached the conclusion that the bird is a duck, whether he's wearing a label or not." R. Immerman, The CIA in Guatemala: The Foreign Policy of Intervention (1982) p. 102. Of course, in this case, the alimony award has a label. That fact, however, cannot be dispositive. See footnote 14 of this opinion. The label does not change the award's function. Cf. *State* v. *Gooch*, 186 Conn. 17, 18, 438 A.2d 867 (1982) ("[p]utting a constitutional tag on a nonconstitutional claim will no more change its essential character than calling a bull a cow will change its gender"). Indeed, the lump sum "alimony" award in the present case looks like a property distribution. It works like one, too.

[26] The majority avoids fully addressing the defendant's claim that the lump sum alimony award is a functional property distribution by expressing no opinion regarding whether the alimony is excessive—although it seems to attempt to justify the size of the alimony award—and by declining to address the defendant's need to invade assets to satisfy his alimony obligation. Instead, it states: "[W]hen a trial court awards a spouse alimony exceeding his or her claimed expenses in the wake of a [premarital] agreement distributing all of the parties' property, the award may still be challenged as *excessive alimony*, rather than a functional property distribution. [The] result [in the present case] does not change this fact. . . . [T]he defendant did not ask [the court] to proclaim the lump sum award as excessive *even if* [the court] determine[s] that the award is *not* a functional property distribution." (Emphasis in original.) Footnote 30 of the majority opinion. This is just semantics. It seems to me that in a case in which the alimony award exceeds both the recipient's needs and the obligor's income—thereby necessitating the obligor to use assets to satisfy the alimony obligation—it should not matter whether the obligor characterizes the alimony award as excessive alimony or a functional property distribution. Under such circumstances, that is a distinction without a difference.

[27] I am not suggesting that a court's alimony award must exactly equal a recipient's support and maintenance needs when there is an enforceable premarital agreement. There most certainly is a zone of reasonable alimony awards. An order that awards nearly $7 million in excess alimony, however, is surely beyond the outer bounds of reasonableness.

[28] The majority appears to "acknowledge" my concerns over the practical consequences of its opinion in the present case. Footnote 30 of the majority opinion. Nevertheless, the majority contends that, if trial courts are "tempted to circumvent a lopsided property distribution contained in an otherwise enforceable [premarital] agreement by awarding large amounts of alimony, [j]udicial restraint counsels us to commend the issue to the attention of the legislature for further review . . . ." (Internal quotation marks omitted.) Id. The majority's statement illustrates the point that its analysis misses. The legislature has already addressed this issue by enacting the Connecticut Premarital Agreement Act (act), General Statutes § 46b-36a et seq. That the majority believes that the legislature must do *more* in order to prevent trial judges from circumventing premarital agreements is akin to directing those judges to ignore the act altogether.

[29] The parties disagree on which standard should be applied to review the premarital agreement in the present case. The plaintiff contends that the agreement should be treated as a postnuptial agreement because it was amended during the marriage, and, therefore, the agreement should be subjected to "special scrutiny" in accordance with *Bedrick* v. *Bedrick*, 300 Conn. 691, 697, 17 A.3d 17 (2011). She contends that the same policy concerns present in *Bedrick*, which resulted in the adoption of heightened scrutiny for postnuptial agreements, are present in this case as well. On the other hand, the defendant claims that the amended agreement should be treated as a premarital agreement because the act expressly provides for the modification of such agreements during the marriage. See General Statutes § 46b-36f ("[a]fter marriage, a premarital agreement may be amended"). Thus, the defendant claims, the enforceability of the agreement should be governed by § 46b-36g, like all premarital agreements. Moreover, the defendant argues that the plain language of § 46b-36g (a) requires such a conclusion in that it provides that "[a] premarital agreement *or amendment* shall not be enforceable if the party against whom enforcement is sought proves" either that such party did not voluntarily enter into the agreement, the agreement was unconscionable, such party was not provided with a fair and reasonable disclosure regarding the property, financial obligations and income of the other party, or such party was not afforded a reasonable opportunity to consult with counsel. (Emphasis added.) Because I have concluded that the

premarital agreement in the present case would not survive the scrutiny required by § 46b-36g, which is less exacting than the scrutiny required by *Bedrick*, I need not decide which standard should be applied to a premarital agreement that is amended during the marriage.

The plaintiff also argues that the defendant has waived the argument that § 46b-36g, rather than *Bedrick*, should govern the enforceability of the agreement. She asserts that the defendant failed to challenge the trial court's application of *Bedrick*, and, therefore, he cannot now challenge it on appeal. As the defendant correctly notes, however, he was not aggrieved by the trial court's enforcement of the premarital agreement and, thus, could not appeal the trial court's decision to apply the special scrutiny required for postnuptial agreements in accordance with *Bedrick*. See, e.g., *Seymour* v. *Seymour*, 262 Conn. 107, 110, 809 A.2d 1114 (2002) ("[o]rdinarily, a party that prevails in the trial court is not aggrieved").

[30] The plaintiff argues that the trial court found that the defendant's income disclosure was inadequate and that the defendant did not challenge that finding in his principal brief in this appeal. Thus, the plaintiff contends, the defendant has waived this claim. The defendant responds that he could not challenge such finding on appeal because, in light of the trial court's enforcement of the premarital agreement, he was not aggrieved by the finding. The plaintiff argues that, in *Bauer* v. *Bauer*, 308 Conn. 124, 60 A.3d 950 (2013), we rejected the very argument the defendant now makes, namely, that a party cannot be aggrieved by a factual finding in the event that such party agrees with the ultimate financial orders.

First, I believe that the plaintiff reads the trial court's decision to establish more than it does. The finding that the plaintiff relies on must be read in context. At trial, the plaintiff argued that the defendant's disclosure of his assets was inadequate because he had valued the assets as of December 31, 2007, rather than contemporaneously with the execution of the amendment to the premarital agreement in July, 2008. In addition, she argued that the defendant had the information necessary for such valuation. The trial court agreed that the defendant could have valued the assets as of July, 2008, but nonetheless found the disclosure of the value of the assets to be adequate. The trial court reasoned that "the evidence supports a finding that the [defendant's] earlier disclosure of [the value of his] assets [was] substantially the same as the financial picture at the time the [amendment] was executed." (Emphasis omitted.) The court then went on to state: "The same, however, cannot be said for the [defendant's] failure to adequately disclose his income for the [eighteen months] preceding the execution of the [amendment] in [July] of 2008." I do not read this to be a finding that the defendant's disclosure was inadequate, in the sense that it was not fair and reasonable as required by § 46b-36g (a) (3), as the plaintiff suggests. Instead, when read in conjunction with the preceding sentence, the trial court's finding was that the defendant's income disclosure was unlike his asset disclosure in that the income disclosure did not provide the plaintiff with a current value of his income, whereas the asset disclosure, despite being based on a six month old valuation, provided a value that was substantially similar to the value of the assets at the time the 2008 amendment was executed. This reading is consistent with the ultimate conclusion of the trial court, namely, that the premarital agreement was enforceable. If the trial court had in fact found that the defendant's financial disclosure was not fair and reasonable, it could not have ultimately enforced the agreement, regardless of whether the court applied the standard set forth in § 46b-36g or in *Bedrick* v. *Bedrick*, 300 Conn. 691, 17 A.3d 17 (2011).

Second, *Bauer* is inapposite. In that case, the factual finding at issue was that "[t]he parties agree to split equally the [husband's] . . . pension and annuity 403 (b) plans . . . ." (Internal quotation marks omitted.) *Bauer* v. *Bauer*, supra, 308 Conn. 126. The trial court's orders, however, failed to address these plans. Id., 127. The trial court subsequently granted the wife's motion for clarification and clarified the ambiguity created by the absence of an order addressing the court's finding that the parties would split the value of the pension and annuity plans. See id., 127–28. In light of the finding that the husband was to split his pension and annuity plans with the wife, the absence of *any* order regarding the plans, and the ambiguity created when the two were considered together, we concluded that the husband was indeed aggrieved by the finding. Id., 135–37. In the present case, however, even though the finding might arguably be to the defendant's disadvantage, the trial court enforced the premarital agreement. Thus, the defendant was not aggrieved and could not have appealed the trial court's finding. See, e.g., *Seymour* v. *Seymour*, 262 Conn. 107, 110–11, 809 A.2d 1114 (2002); see also footnote 29 of this opinion.

[31] We noted that such factors may be relevant to whether a party executed the premarital agreement voluntarily or whether the agreement was substan-

tively fair, but they do not affect the adequacy of the disclosure. *Friezo* v. *Friezo*, supra, 281 Conn. 193. Thus, the timing of the disclosure or the ability of the recipient of the disclosure to understand it may serve as a basis for finding an agreement unenforceable under § 46b-36g (a) (1) (voluntariness), or § 46b-36g (a) (2) (unconscionability).

[32] Schedule E income can include real estate rental income, royalties, and income from partnerships or S corporations.

[33] The Appellate Court's reasoning in *Beyor* is flawed for a number of reasons. First, a premarital agreement is enforceable only when it is entered into voluntarily. See General Statutes § 46b-36g (a) (1). In *McHugh*, we noted that, in order for the waivers effectuated by a premarital agreement to be voluntary and knowing, the waiving party must "be aware of any right that he [or she] possesses prior to a proper waiver of it." *McHugh* v. *McHugh*, supra, 181 Conn. 486. We explained that fair and reasonable disclosure is a prerequisite to a valid agreement precisely because each party must know what is being waived. See id. Thus, with respect to *Beyor*, that the wife had waived any right to alimony is of no consequence to the adequacy of the husband's disclosure. Indeed, the fact that the husband did not make a fair disclosure of his income calls into question the validity of the wife's waiver. Second, in *Friezo*, we noted that financial disclosure in this context is a duty to inform, and, accordingly, the focus of the examination should be on the actions of the disclosing party, not on the party to whom disclosure is made. See *Friezo* v. *Friezo*, supra, 281 Conn. 192–93. Because disclosure is a duty to inform, the fact that the wife in *Beyor* knew of the significant disparity in her wealth and the husband's wealth misses the mark. The Appellate Court's focus should have been on the husband's disclosure. Of course, if the wife had *sufficient*, independent knowledge of the husband's income, then the husband would not have had to make a fair and reasonable disclosure of such income. See id., 188 (noting that majority of jurisdictions require disclosure "when a party's independent knowledge is insufficient"); *Winchester* v. *McCue*, 91 Conn. App. 721, 729, 882 A.2d 143 (holding that premarital agreement was enforceable despite omission of parties' income from disclosures because parties possessed independent knowledge of each other's financial situation), cert. denied, 276 Conn. 922, 888 A.2d 91 (2005). It does not appear to me, however, that the Appellate Court's decision was based on the conclusion that the wife had sufficient knowledge of the husband's *income*, as opposed to his wealth. Third, and finally, the 2006 Schedule E income was a significant portion of the husband's annual income. In his financial disclosure, the husband disclosed a weekly gross income of $4610. *Beyor* v. *Beyor*, Conn. Appellate Court Briefs & Appendices, March Term, 2015, Plaintiff's Appendix p. A33. That is $239,720 annually. The undisclosed Schedule E income was $394,048; *Beyor* v. *Beyor*, supra, 158 Conn. App. 762; approximately 62 percent of the husband's $633,768 annual income in 2006. It strains credulity to suggest that the husband's financial disclosure was fair and reasonable, despite the omission of such a substantial portion of his income.

[34] This is not to say that, in all instances, a disclosure of historical income data would not constitute a fair and reasonable disclosure of the disclosing party's current income. For example, in *Friezo*, the parties executed the premarital agreement in November, 1998, but the husband disclosed his 1997 gross income. *Friezo* v. *Friezo*, supra, 281 Conn. 177, 191. In that case, we did not decide whether the disclosure was fair and reasonable despite the disclosure of past, rather than current, income because the wife did not make such an argument. Nonetheless, I can imagine a set of circumstances in which such a disclosure would be fair and reasonable, such as those in which the disclosing party's income does not materially fluctuate from year to year. That is not this case, however, when one's income has varied significantly. In 2006, the defendant's income increased to nearly $1.7 million from approximately $900,000 the year before. Then, in 2007, his income decreased to approximately $1.25 million. Finally, in 2008, his income had fallen to approximately $575,000. This income range of more than $1 million in just four years is not an immaterial fluctuation.

[35] Neither party has argued that the invalidation of the 2008 amendment on the basis of an inadequate financial disclosure would reinstate the original 1997 premarital agreement. Thus, despite my grave reservations regarding the unconscionability of the original premarital agreement, I express no opinion on the validity of such agreement or the possible claim that such agreement should be reinstated in light of the invalidation of the amendment to that agreement.